1  Lloyd Thomas Bernhard, II, In Pro Se
   25526 S. Bird Road

2  Tracy, California 95304
   T: (209) 362-8330

3  E: bernhardltb@gmail.com

4  Stephanie Celeste Tejada-Otero, In Pro Se
   25526 S. Bird Road

5  Tracy, California 95304
   T: (209) 362-8330

6  E: redwoodforestt@gmail.com

7  Plaintiffs, In Pro Se

8



FILED

DEC 30 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

9             IN THE UNITED STATES DISTRICT COURT

10        FOR THE EASTERN DISTRICT OF CALIFORNIA

11  LLOYD THOMAS BERNHARD, II,            Case No:  2:21-CV-0172 TLN DB PS

12  An individual,                        **FIRST AMENDED COMPLAINT**

13  STEPHANIE CELESTE TEJADA-OTERO, An    Claim 1: 42 U.S.C. Section 1983
14  individual,                                    (Unwarranted Seizure)

15                                        Claim 2: 42 U.S.C. Section 1983
                                                   (Coerced/Unwarranted Medical
                                                   Examinations and Procedures)

16                        Plaintiffs,     Claim 3: 42 U.S.C. Section 1983
17                                                 (Judicial Deception,
                                          Unnecessary/
18  Vs.                                             Excessive Duration of Continued
                                                    Detention)
19

20                                        Claim 4: 42 U.S.C. Section 1983
                                                   (Malicious Prosecution)
21  COUNTY OF SAN JOAQUIN, a public entity,
    SAN JOAQUIN COUNTY HEALTH AND         Claim 5: *Monell*-Related Claims
22  HUMAN SERVICES AGENCY, a subdivision or
    entity of THE COUNTY OF SAN JOAQUIN,          - Count One
23  ADRENNA TORRENCE, an individual, LESLIE           (Unwarranted Seizures)
    BILLINGS, an individual, SONIA PIVA, an
24  individual, SHANNON BLANKENSHIP, an           - Count Two
    individual, DIANE NOWAK, an individual,          Unwarranted Medical
25  VALESQUEZ – first name unknown, an               Examinations/Procedures)
    individual, JASMINE CEJA, an individual,
                                                  - Count Three
                                                     (Judicial Deception)

1

FIRST AMENDED Complaint
BERNHARD, TEJADA-OTERO V. Co. of San Joaquin
Case No: 21-CV-0172 TLN-DB PS

1  individual, MISTY ARBUCKLE, an individual,          **JURY TRIAL DEMANDED**
2  DANEVIA RHONE, and individual, MARISOL
   ENOS-SCHAFFER, an indivdua; YENI
3  GONZALES, an individual, DOE HHSA Workers
   2-10, known but unidentified individuals; and
4  DOES 1 through 50, inclusive,

5

6                          Defendants

7

8

9

10                    **Jurisdiction and Venue**

11  1.      This action is brought pursuant to 42 U.S.C. §1983 to seek redress for

12  Defendants' actions taken under color of law which violated Plaintiffs' rights under

13  the United States Constitution. Defendants' conduct deprived Plaintiffs of their

14  fundamental constitutional rights secured under the United States Constitution's

15  First and Fourteenth Amendments, and under federal law.

16  2.      Jurisdiction is conferred by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which

17  provides for original jurisdiction in this Court of all suits brought pursuant to 42

18  U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for

19  relief derive from the United States Constitution and the laws of the United States.

20  This court has supplemental jurisdiction over Plaintiffs' state law causes of action

21  pursuant to 28 U.S.C. §1367(a).

22  3.      Venue properly lies in the Eastern District of California, in that the acts and

23  omissions, events and circumstances complained of herein occurred in the County of

24  San Joaquin, and it is believed that at least one defendant resides in the County of

25  San Joaquin.

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO  vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

4.      Plaintiffs make the following allegations and claims upon personal knowledge and belief.

## The Parties

5.      At all times relevant to this Complaint, Plaintiffs Lloyd Thomas Bernhard, II, and Stephanie Celeste Tejada-Otero, were residents of San Joaquin County, California, and the biological parents of a daughter, At.B. (DOB: 4/7/16) and biological parents of a daughter Al.B (DOB: 11/13/17).

6.      The childrens' full names are known to all defendants, and are being withheld herein, unless otherwise ordered by the court, to provide them some level of confidentiality.  The adult Plaintiffs may also be referred to collectively herein as "parents" and/or "plaintiffs."

7.      Prior to the removal of the children from the parents on or about January 29, 2019, as detailed in the Juvenile Dependency Court Records, the parents raised, nurtured, provided guidance, education, and care, for the minor children, in a loving, emotionally, academically and financially supportive, intact nuclear family.

8.      The Plaintiffs' children may collectively be referred to herein on occasion as "the child(ren)."

9.      Defendant County of San Joaquin ("County") is a public entity of which the San Joaquin County Health and Human Services Agency ("HHSA") is a subdivision.

10.     HHSA is a County governmental agency organized and existing pursuant to the law and policies of defendant County, which together with County, promulgated, encouraged, and/or permitted, the policies, patterns, and pracctibes under which the individual Defendants and Does 1 – 50, committed the acts or omissions complained of herein, and condoned, ratified, and encouraged the conduct of the

3

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

County employee-defendants, as complained of herein, or failed to train, or inadequately trained the County employee-defendants.

11.     At all times relevant to this Complaint, HHSA Worker Adrenna Torrence ("Torrence") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

12.     At all times relevant to this Complaint, HHSA Worker Leslie Billings ("Billings") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

13.     At all times relevant to this Complaint, HHSA Worker Sonia Piva ("Piva") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

14.     At all times relevant to this Complaint, HHSA Worker Shannon Blakenship ("Blankenship") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

15.     At all times relevant to this Complaint, HHSA Worker Diane Nowak ("Nowak") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

///

///

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

16.   At all times relevant to this Complaint, HHSA Worker Valesquez, first name unknown ("Valesquez") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

17.   At all times relevant to this Complaint, HHSA Worker Jasmine Ceja ("Ceja") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

18.   At all times relevant to this Complaint, HHSA Worker Adriana Calderon ("Calderon") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

19.   At all times relevant to this Complaint, HHSA Worker Misty Arbuckle ("Arbuckle") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA, and on information and belief was also serving as Worker Sonia Piva's direct supervisor during the time of the events alleged herein. At all relevant times she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

20.   At all times relevant to this Complaint, HHSA Worker Danevia Rhone ("Rhone") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA, and on information and belief was also serving as Worker Sonia Piva, Misty Arbuckle, Marisol Enos-Schaffer, and Yeni Gonzales' direct supervisor during the time of the events alleged herein. At all relevant times she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs,

5

policies, and practices of the County of San Joaquin in doing the things alleged herein.

21.   At all times relevant to this Complaint, HHSA Worker Marisol Enos-Schaffer ("Enos-Schaffer") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

22.   At all times relevant to this Complaint, HHSA Worker Yeni Gonzales ("Gonzales") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

23.   At all times relevant to this Complaint, DOE HHSA Workers 2 - 10 were individuals residing in the County of San Joaquin, and officers, agents, and/or employees of the County of San Joaquin and HHSA acting within the course and scope of their duties, under color of law, and pursuant to the regularly established customs, practices, and policies of the County of San Joaquin in doing the things herein alleged. Plaintiffs are ignorant of the true names and capacities of those DOE HHSA Worker Defendants sued herein as DOE HHSA Workers 2 - 10, and for that reason has sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE HHSA Worker Defendants when their identities have been ascertained. Each of the fictitiously named DOE HHSA Worker Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

24.     Hereinafter, when referred to collectively, the Defendants in paragraphs 11 through 23, inclusive, may occasionally be referred to as the HHSA Defendants.

25.     Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Defendant DOES 1 through 50, and for that reason have sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE Defendants when their identities have been ascertained. Each of the fictitiously named DOE Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

26.     Plaintiffs are informed and believe and, based upon such information and belief, allege that each of the Defendants is responsible in some manner for the events and happenings referred to herein and was the legal cause of injury and damages to Plaintiffs as herein alleged.

27.     Plaintiffs are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every Defendant was the agent and/or employee of their co-defendants, and each of them, acting at all relevant times herein under color of the aurhotity of governmental entity under the statutes, ordinances, regulations, customs and usage of the State of California and/or the United States Constitution and related laws.

28.     Whenever this Complaint makes reference to any act of "Defendants," such allegations shall be deemed to mean all named Defendants, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants (or any of them) and while acting

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1  within the course and scope of their duties, except as specifically alleged to the

2  contrary.

3  29.   At all times relevant to this Complaint, Defendants, and each of them

4  including all DOE Defendants, were the knowing agents and/or alter egos of one

5  another.  Defendants directed, ratified, and/or approved each other's conduct and

6  that of each other's agents or employees. Defendants, and each of them including

7  all DOE Defendants, agreed upon, approved or ratified each other's conduct, or

8  otherwise conspired together to commit all of the acts and/or omissions alleged

9  herein.

10  30.  The HHSA Defendants, and each of them, were at all relevant times acting

11  within the course and scope of their duties as employees of the County of San

12  Joaquin.

13  31.   Plaintiffs are informed and believe and, based upon such information and

14  belief, allege that each of the Defendants is responsible in some manner for the

15  events and happenings referred to herein and was the legal cause of injury and

16  damages to Plaintiffs as herein alleged.

17  32.   The HHSA Defendants, and each of them, were at all relevant times acting

18  within the course and scope of their duties as employees of the County of San

19  Joaquin.

20  33.   The HHSA Defendants, and each of them, were at all relevant times acting in

21  conformance with the regularly established customs and practices of the County of

22  San Joaquin.

23  34.   The HHSA Defendants, and each of them, were at all relevant times acting

24  under color of law.

25  **Summary of Allegations**

8

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

35.     Defendants , Piva, together with an unknown HHSA worker, seized Plaintiffs'
children on 01/29/19, at a home that was previously agreed upon with the court
appointed counsel for minor children, Gabrielle Tetreault, and was arranged through
parents full and cordial cooperation.  The agreement was that maternal
grandmother would be with the children at the home address provided by parents
on 01/29/19, parents would be present in court on 01/30/19, as this was the first
knowledge they had of a juvenile dependence court appearance referencing their
children since they had all been out of town for a pre-planned trip.  Parents were
not served with a warrant of any notice of any juvenile dependence hearing. Once
parents learned of the 01/30/19 court appearance, they immediately cooperated.
Prior to 01/29/22, it was agreed through the court appointed attorney for the minor
children, Tetreault, that the children were fine and no seizure of the children would
occur, and parents would appear in court on 01/30/19, again, as they had just
learned of same.  Defendant Piva was aware that parents were never served with
Notice of Hearing or warrant.  Piva was aware of the agreement between Tetreault
and parents, however, nevertheless, once Piva obtained the home address for the
children on 01/29/19, which parents willingly provided to Tetreault, defendant Piva
immediately arranged for a police escort, that same afternoon on 01/29/19, to meet
her at the location parents provided, so that she could seize the children, without
first obtaining a legal and/or proper warrant or parental consent. When police
officers arrived at the home prior to Piva arriving, they knocked on the door and hac
a friendly conversation with materal grandmother stating that they had received a
dispatch to wait for the HHSA workers to arrive at the home, and informing
maternal grandmother who was startled by their arrival, telling her not to worry
everything looks fine and they just probably want to see that the children are here

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

and okay and that's it.  It was not their understanding that defendant Piva or any
other HHSA worker was coming to seize the children.  Upon Piva's, together with
another HHSA worker's arrival to the address parents provided regarding their
children, Piva stood on the outside of the front door of the house where law
enforcement also was, demanding of materal grandmother that she was to
immediately hand over the children in her custody while handing her a "warrant" for
same. Piva nor her accomplish ever asked to come in the home, instead they chose
to wait outside the open front door to be handed the children.  Children did not
want to go with Piva and were distressed when they had to leave their maternal
grandmother's care. When Tetreault became aware of Piva's actions on the
afternoon of 01/29/19, and her seizure of the children, she was very upset.
Subsequently, Piva communicated and documented that she only received a "tip" as
to the location of the children on 01/29/19, inferring their location was received
without the parents cooperation.  Piva did not document or mention how she
received the "tip" or from whom, and intentionally omitted the fact of any
involvement or mention of the minors' court appointed Attorney Tetreault was the
individual who recommended the arrangements and agreement regarding the
children who were to be with their maternal grandmother on 01/29/19, with
parents full cooperation. On 01/24/19, Piva sent an email to District Attorney Buzo,
which states in part, that the HHSA, "As of now, we have had no luck on our end.
I've called the phone numbers on file for the parents and they either go straight to
voicemail or are disconnected.  I've also left a message for the grandmother."  Piva
does not identify which grandmother she "left a message for" and what the message
said that was "left" or where it was "left,"  Neither grandmother received a message
from Piva. Parents did not receive a message from Piva. Piva goes on to state in her

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

01/24/19 email to District Attorney Buzo that in a "routine traffic stop" "grandmother" told the Tracy Police Officer "law enforcement" that "the family left for vacation." Piva further states to D.A. Buzo, "As for the warrants it is my understanding that they are correct for our Agency, but we understand that Law enforcement does not acknowledge them as a viable warrant." Piva and her accomplice, seized the children on 01/29/19, even though they had no evidence to suggest that the children were in immediate danger of sustaining severe bodily injury or death in the short period of time it would normally take to obtain a legal, proper warrant. Piva and her accomplice did these things without first pursuing reasonable means of investigation, and without even thinking to consider lesser intrusive alternative means of ameliorating any perceived threat, real or imaginary, to the Plaintiffs' children. Of note is that on 01/16/19, defendants Piva and Arbuckle met with District Attorney Sant at the D.A. office. Mr. Sant informed defendants, Piva and Arbuckle, that he spoke with Judge Abdallah who had signed the warrant presented to him on January 3, 2019, but thereafter agreed he was in a hurry when he signed the Order. It was relayed to the defendants that those warrants were to be thrown out and new warrants would need to be prepared. Plaintiffs are not aware that this was ever done. Again, no warrants were ever served on parents.

36.   Once the children were seized and firmly ensconced in the County's "care," Defendant Piva, Torrence and Calderon fabricated material evidence and suppressed material exculpatory evidence in crafting reports which they submitted to the Juvenile Court in order to continue At.B's and Al.B's detention from their parents' custody. Their efforts to mislead the Juvenile Court were effective and resulted in this family being needlessly torn apart and separated for a grossly excessive period of time.

37.   While the plaintiffs' tender age children were in the County's custody, the defendants subjected the children to multiple unwarranted investigatory medical examinations and procedures, and taking of photographs of the children, without the parents' consent, and in at least one instance over the parents' strenuous objections.

38.   This is not the first time the County of San Joaquin and its workers have been sued due to its workers seizing children without just cause, conducting unwarranted medical examinations, and lying to the Juvenile Court in Court Reports. The fact of the matter is that these things happened, and continue to happen, on a fairly regular basis to other families due to San Joaquin County's system wide deliberate indifference to the rights of parents with whom its workers regularly come into contact; and, its deliberate indifference to the need to train and supervise its workers to ensure they adhere to the constitutional mandates that restrict and circumscribe their power to seize children and obtain medical examinationss without first obtaining a warrant.

## Underlying Facts

### *- Stephanie and Lloyd Get Engaged and Start Their Family*

39.   Stephanie Tejada-Otero was a student at Lathrop High School where she was an Honor Roll student.   In Jr. High School, she was nominated and voted the School's Student Body President for all of the 8th Grade.   At that time as well, she was the Captain of her Volley Ball Team and Caption of her Soccer Team.   Once in High School, Stephanie was a champion swimmer on her High School team.   She was on her school's Speech and Debate Team.   Academics and sports were very important to her as she always strived to get good grades, especially straight A's. She enrolled herself in Life Management classes, Photography classes, Culinary

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1  classes and Fashion and Design classes.  In fact, she was so advanced and talented in
2  her Fashion and Design class that her teacher would have to customize a more
3  complex class final examination for Stephanie since she had already excelled during
4  the regular school year in the questions and assignments that were previously
5  prepared for the standard class final.  She also enjoyed singing in her Chior class, as
6  well as sewing, cooking, dancing, cosmatology, and interior design.  Due to her
7  family's schedule, she would have to walk the several miles from her family's home
8  to and from her high school each school day.  Come rain or shine, Stephanie would
9  indeed walk those several miles each day to and from school, usually alone, with her
10 books and binders in her backpack.  This would entail waking up extra early to
11 account of the walking distance and time it would take her to arrive at school on
12 time and get to the classes she so much enjoyed.  Many days, sometimes before
13 school, after school or on the weekends, Stephanie would be in the company of her
14 younger cousins and would enjoy associating with them and frequently volunteering
15 to babysit some of them as well.  Stephanie has always had a love of reading and
16 usually you can find her reading a book in her quiet time.  She is bilingual and helps
17 interpret whenever needed in any setting.  Stephanie has always had a love for
18 animals and has rescued and nurtured many of them throughout the years.  She also
19 participated as a participated as a volunteer at an animal shelter and rescue non-
20 profit organization.  Her friends and family refer to her as the "animal whisperer"
21 because of her kind and gentle way with animals.

22 40.    Lloyd Bernhard attended and graduated from Lathrop High School.  Lloyd was
23 an Honor Roll Student who was enrolled in Pre A.P. and A.P classes.  In addition,
24 Lloyd was a student athlete and was nominated and received his High School
25 Football Team Captain Star and Most Inspirational Player Trophy.  In the years

13

growing up, Lloyd played several other sports, including as a Pitcher in Baseball for 7 years, Soccer, Basketball, Wrestling, Karate, Surfing, Diving, Swimming - where he earned his Life Guard Certification, and he indeed saved the life of a toddler which no one saw, (except for Lloyd), fall in the deepest part of the busy swimming and saved the toddler from drowning.  At the age of 3 years old, Lloyd was brought up with a family R.V. and was constantly going on family outings and vacations.  In Junior High School Lloyd was nominated by one of his teachers as a United States Student Ambassador, unbeknownst to him.  Thereafter, through quite of process collection of background information regarding character, academic records, and interviews with Lloyd, he was selected as a United States Student Ambassador to France, Italy nd Greece which prior to a 21 day oversees stay in each country, he together with 21 other Student Ambassador's selected throughout the U.S., met monthly for one year, to learn each selected visiting country's government, language, (he studied and spoke the French language for 2 years), customs, and so forth, because at the end of that year's studies the 21 students would then travel together to those specific selected countries to meet and associate with other students just like them in another part of the world.  The U.S. Student Ambassadorship was started by President Dwight Eisenhower with the hopes that if students who display positive leadership qualities as youth, and learn about other counties in their youth, and actually travel to those lands and meet those youth personally, they will see, they are just like them, so when they grow up it will bring "peace through understanding."  Lloyd was first selected as a U.S. Student Ambassador in Junior High School because of his perfect score on the California State STAR test and because of his positive leadership qualities.  After his first successful Ambassadorship to France, Italy and Greece,  Lloyd was again nominated

and selected, this time as a U.S. Student Ambassador to Australia. Lloyd went

through the same process over the year prior to traveling to Australia, and while in

Australia, he donated his own funds to provide protection for the natural roaming of

native Australian tortoises who swim/cruise in the Great Barrier Reef, where he also

scuba dived with them and other sea life while there. Lloyd cooked and ate with the

native aborigines, cuddled with Koalas, enjoyed the wild herds of kangaroos, and

played sports with Australian students, visited their homes, and their government

offices, and much more. Lloyd longed to teach his own children one day, the same

values and principles he espoused and wished to encourage the same understanding

and experiences toward whatever his children would find interesting to them.

41.    Stephanie and Lloyd met in 2015, while they were students in the same Choir

Class in High School. Lloyd especially enjoyed Wednesdays in school because that

was always the day Stephanie would have her culinary class and after school would

bring Lloyd something special and very tasty that she had prepared for him to eat.

Through their choir class, they both would volunteer to participate in performing in

the community Tree Lighting Ceramony, parades, and fall concerts. Lloyd and

Stephanie maintained a friendship throughout this time. They often would serve

meals to the homeless, participate in a school Veteran's Breakfast and Lloyd

personally wrote to a known Holocost Survivor who he wrote to, and arranged to

travel to his high school, she accepted, and gave a very moving speech and

presentation to his entire high school regarding her personal experience during the

Holocost. Over time, their friendship matured into something more serious.

Stephanie studied for and earned her Cosmatology Certificate. She sought

employment at Alta Beauty and Cosmetic Store and was slected to join their team,

which she eagerly did and thrived. Stephanie also started her own business as a

15

1  special event planner and choreographed her own music and taught dance routines
2  for such events. After High School, Lloyd worked for the school district, and also
3  pursued his passion and enjoyment of automobiles and working on them. Stephanie
4  and Lloyd became engaged in 2016, and moved in together in their own quaint 3
5  bedroom residence.

6  **- Stephanie and Lloyd Decide to Have a Baby**

7  42. Stephanie and Lloyd wanted to have a child together. They had secure
8  employment, their own nice, clean and tidy residence, had family nearby. When
9  Stephanie became pregnant, they could hardly wait for their daughter to be born.
10  They were so excited to meet her, love her, care for her and introduce her to family
11  and friends. On April 7, 2016, At.B. was born, fully developed and healthy in the
12  hospital with all family around. They felt blessed with their new little sweet
13  daughter. They were a loving family. Lloyd and Stephanie carefully chose their
14  daughter's name which had a meaning of the Greek Goddess of Wisdom, always
15  accompanied by her owl and the goddess of victory. They wanted this name as a
16  powerful inspiration for their baby daughter. Lloyd had visited Athens while in
17  Greece prior to At.B. being born.  From the moment At.B. was born, Lloyd and
18  Stephanie doted on her, as did their entire families and friends. Paternal
19  grandmother, along with others, were indeed stationed outside their hospital room,
20  before, during and after At.B.'s birth. Lloyd and Stephanie had everything ready for
21  their arriving newborn, and had, prior to her birth, decorated their daughter's own
22  room at home, complete with a brand new crib, stuffed animals and child
23  decorations around the room, rocking chair, baby monitors, sweet clothing, and
24  plenty of baby supplies and a special poster on the wall with their daughter's name
25  spelled out in large beautiful, colorful flowers. They also had purchased the best

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

and most secure care seat for their newborn which they did a lot of research on and brought it with them to the hospital to place their daughter's in after her birth to safely ride home in.

43. Lloyd and Stephanie followed the recommendations for their daughter's sleep and feeding schedule.  Prior to their daughter's birth, they did their own research and reading, regarding newborn's needs.  Due to the well recognized health benefits of breast feeding, in consultation with their medical provider, Lloyd and Stephanie made the decision to breast feed At.B.

44. At.B.'s typical day would start at about 7:00 a.m. when feeding would occur at that time and througout the day.  Upon At.B.'s waking, Stephanie and/or Lloyd would change their daughter out of her pajamas and diaper if it was wet.  After feeding and diaper changing.  At.B. would have tummy time on her cushioned baby floor mat with mommy and/or daddy baby taking with her.  Lots, and lots of pictures of At.B. were frequently taken with sweet pride.  There was also time in her upright secure bouncer seat for babys.  Throughout the day, Stephanie and Lloyd securely placed At.B. in the Babybjorn Baby Carrier against their front chest.  Both Stephanie and Lloyd would routinely talk and sing to At.B.

45. The rest of At.B.'s day was similarly structured with everything from playtime to nap time being scheduled as recommended by child rearing professionals.  Feeding and naps were timely and At.B. was always well fed, cleaned, rested, and loved. At.B.'s day would start winding down around 5:25 p.m., thereafter she was brought to her bassinet to get ready for bedtime.

46. At.B. continued to flourish, in good health and proper care, lots of love and constant family association.

17

47.  When At.B. was about a year old, Lloyd and Stephanie and At.B. resided in a beautiful well kept, large 2-Story, 4 bedroom home with a well maintained backyard in Tracy, California.  Paternal grandmother, Roxane, and, paternal uncle, Randy, resided together with Lloyd Stephanie and At.B., as well.

### - Stephanie and Lloyd Decide to Have another Baby

48.  Stephanie and Lloyd decide to have another baby and give At.B. a sibling. At.B. is now about a year and a half and Al.B., a sister, is born on November 13, 2017.  Everyone is ecstatic with the blessing of this new well developed, healthy baby.  At.B. dotes over her newborn little sister as do Stephanie, Lloyd, Paternal Grandmother, Roxane, and Paternal Uncle, Randy, along with all other visiting family members and friends.  Their new daughter's name is also carefully chosen, which relates to love, honesty, creativity, success, and in addition she is given a beautiful middle name which honors her well loved Great Grandmother.  Parents incorporate At.B. with their daily routine alongside her sister, with specific consideration and attention to their newborn's needs and schedule.  At.B. is a sweet, happy baby, enjoying an abundance of family love.  Lots of pictures are taken of the children and the whole family together.  They are now a loving, happy family of four.

*- On December 16, 2018, At.B. finds her way through the front door of her home, and within minutes therefrom, reportedly steps onto the neighborhood street while her mother is taking a few quick moments, while both children are napping upstairs, to give food and water to their family dogs who are in their backyard.*

49.  December 16, 2018, was just like any other day. Family rises in the morning, parents go to crib where At.B. is waking up, Stephanie meets her with a warm smile, a "good morning" greeting as usual, and picks her up out of her crib all the while

cuddling her.  Next, little sister, Al.B., is just starting to wake up as well in her bassinet.  Lloyd gently picks her up out of her bassinet, she is also met with a warm smile from dad and a "good morning" greeting followed by a warm hug.  Lloyd and Stephanie happily tend to At.B. and Al.B, changing diapers and pajamas.  The family goes downstairs together and breakfast is properly prepared and children are promptly and appropriately fed breakfast.  Thereafter, the morning was normal and uneventful.

50.   Parents spent the day with At.B. and Al.B. at home.  In the early afternoon, of December 16, 2018, Lloyd makes a trip to the store for items needed.  Children are at home with Stephanie, playing, and taking nap time accordingly.  While Lloyd is at the store, sometime just before 3:08 p.m., At.B. somehow finds her way through the front door of her home, and within minutes therefrom, reportedly steps onto the neighborhood street while Stephanie is taking a few quick moments to give food and water to their family dog in their backyard.  Stephanie only goes out momentarily to feed the dogs in the backyard while At.B. and Al.B. are napping upstairs.

51.  Within seconds of stepping back in their house from just giving the family dogs food and water in their backyard, Stephanie immediately notices that their front door is open and when she walked through the door to investigate, she saw At.B. being held by a lady standing right next to Stephanie's garage door holding At.B.  Stephanie immediately asks what's going on.  Upon seeing Stephanie who had just approached her, this unknown lady starts yelling at Stephanie and being very rude.  At the same time, Stephanie sees and hears the lady next door standing in her yard who also begins screming at Stephanie shouting derrogatory comments at her.  Stephanie reaches for and takes At.B. in her arms from the unknown lady, tells them

19

to leave her alone, does not engage in an argument, and proceeds to walk into her

own house with her daughter and shuts the door.

52. Of note, the shouting neighbor lady had recently moved in next door with her

parents while she was currently in the middle of a custody battle over her young

son, and divorce proceedings.  When she confronted Stephanie screaming, telling

her that some unknown person driving by, saw At.B. in the street in front of

Stephanie's house but knocked on the neighbor's front door asking if she knew this

child, she continued screaming terrible insults to Stephanie in the front yard.  There

is a history of problems coming from the plaintiffs' neighbor, the reporting party to

TPD this incident on 12/18/19.  This same neighbor lady is constantly heard publicly

loudly and caustically arguing with other people at various other times, including

doing same every time her husband, who she screams she is in the process of

divorcing and lives elsewhere, drops off their young son for her visitation time with

their child.  As well, this neighbor's teenage resident, is also heard screaming and

pacing on the outside sidewalk, on numerous occasions telling everyone around that

he wants to "kill" himself.   On another occasion, Lloyd and Stephanie called TPD on

those very same neighbors who for no reason at all, put a knife through their

adjoining backyard fence and stabbed their family dog, having Lloyd and Stephanie

rush the dog to the vet for care and stitches, which Stephand and Lloyd presented to

TPD.  As well, it was reported, after sightings, that this same screaming neighbor

lady would go around outside at the early dark morning hours ringing other

neighbor doorbells and running away before the door was answered, just to cause

trouble.  Lloyd and Stephanie kept their distance from that lady because of her

caustic and bizarre behavior.  However, Lloyd and Stephanie, got along well with the

other neighbors who had lived around them when Lloyd and Stephone moved in

20

that neighborhood.  Those neighbors would frequently be invited to gatherings hosted by and held at Lloyd and Stephanie's home as well as neighborhood children invited to birthday parties for Lloyd's children at their home as well, where fun and good times was had by all.

53.  Very shortly thereafter about 5 minutes from the intial call toTPD, and after the confrontational next door neighbor and the unknown person in the car had gone, a Tracy Police Officer came knocking at Stephanie's front door.  The Tracy Police Department Calls For Service Report documented the following:  "Date: 12/16/18 Time:  15:08:08 2YR OLD FEMALE WAS RUNNING AROUND OUTSIDE...WENT INSIDE" at about 5 minutes after initial call, TPD officer arrives at plaintiffs home for a "WELFARE CHECK"  TPD Officer goes to Stephanie's front door.....Stephanie cordially answers the door and proceeds to have an amicable conversation with this Police Officer.  He explains why he was there and Stephanie said those people were rude and that she did not know how her child had gotten out and invited the Officer to come in.  Lloyd had not yet arrived back home from the store.   Stephanie proceeds to invite the TPD Officer to come in her home.  TPD Officer tells Stephanie it is not necessary for him to come in but she insists.  The Officer did so, and his body camera caught at least a partial sweep of the entryway to the home and the nearby dining room area which captures a clean, neat, tidy, well kept and furnished home.  He sees the doorknob on the inside of the front door which had a child safety mechanism attached to that front doorknob that would have kept At.B. from even turning the knob from the inside.  He sees the child gate at the bottome of the stairs.  At.B. is in Stephanies arms, quiet and happy.  He asks Stephanie where is their other child and she proceeds to tell him she is upstairs napping and offers to take him up to her room to see her.  The TPD officer says that is not necessary since

1 the child is sleeping.  TPD Officer tells Stephanie not to worry "this happens all the
2 time with children" and proceeded to tell her that this had happened with his own
3 children. Officer sees At.B., observes the home, hears no crying by Al.B. and at the
4 time of "15:29:39" the TPD Service Report documents "KIDS ARE FINE" - "15:29:53
5 PER #C11" - "15:32:41 Closed dispo : SERVICE RENDERED."

6 54. Sometime thereafter, Lloyd returns home from the store and Stephanie
7 proceeds to let him know what happened while he was gone.

8 *- On January 2, 2019, 18 days after the December 16, 2019 incident, HHSA worker*
9 *Torrence arrived at the plaintiffs residence to conduct an unnounced home visit*
10 *stating she is following up on the December 16, 2019 incident.  Children are*
11 *sleeping at the time of her arrival.  Stephanie invites Torrence to come back and*
12 *relays that an appointment can be made within a week or two, for her to return*
13 *when at a time when the children are awake.*

14 55. Stephanie answers door and steps outside when Torrence arrives at her home
15 on 01/02/19.

16 56. Torrence states to Stephanie she is there as a follow up to the 12/18/19
17 incident, albeit 18 days later.

18 57. Stephanie tells Torrence the children are sleeping and she can make an
19 appointment with Stephanie and the children to come back in a week or two at a
20 time when they are awake.  Torrence quickly became combative and refused
21 Stephanie's request, said she could make an appointment to come back, but not in a
22 week or two, and she proceeds to stomp off.

23 *- On 01/03/19, unbeknownst to Plaintiffs because earlier that day they had*
24 *all left for a pre-planned trip, but according to the 01/16/19 Detention Report, "at*
25

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1  *approximately 10:30 a.m." Torrence quickly sought and received a signed Order for*
2  *Entry by Judge Abdallah.*

3  58. On 01/03/19, at 10:30 a.m. Torrence received a signed Order for Entry by Judge
4  Abddallah.

5  59. Plaintiff's do not have, at this time, the transcript of the 01/03/19 proceeding as
6  to what was told to Judge Abdallah by defendants in order to secure his execution of
7  an Order for Entry to be served on Plaintiffs. Plaintiffs will request this and other
8  items and testimony during the discovery process of this case.

9  *- On 01/03/19 "at approxiimately 11:00a.m." according to the 01/16/19*
10  *Detention Report, "SW Torrence and SW Velasquez  arrived at the residence for an*
11  *unnounced home visit.  Torrence knocked on the door several time [sic] to no*
12  *answer."*

13  60. On 01/03/19, at 11:00 a.m. defendant Torrence returns with defendant
14  Velasquez accompanied by TPD to serve Order of Entry on Plaintiffs.  Torrence
15  knocks several times on front door of plaintiffs home and there is no answer.

16  61. On 01/03/19, TPD Body Cam video captures a TPD Officer stating to defendants,
17  "He may not be here cuz his truck's not here."

18  62. On 01/03/19 with Torrence and Velasquez still at plaintiffs' front door, TPD Body
19  Cam video captures who appears to be defendant Velasquez stating "usually" the
20  Order/Warrant is only good for 24 hours.

21  63. On 01/03/19, in speaking with Torrence and Velasquez, TPD Body Cam video
22  captures TPD Officer speaking with one of the defendant social workers who states,
23  "We don't have that they are in danger right now, cuz we haven't gotten in."

24  64. On 01/03/19 in speaking with Torrence and Velasquez, TPD Body Cam video
25  captures TPD Office asking defendants Torrence and Velesquez while still outside

23

Plaintiff's home to serve Order/Warrant for Entry, "So your main goal is just to get in the house check on the kids and look at the inside of the house." Defendants reply, "Yeah".

*- On 01/06/19 TPD Officer is at plaintiffs front door, and in speaking with defendant social workers who are present outside Plaintiff's home as well to serve Order/Warrant for Entry, states that he has been there the day before and one day before that. Defendant Social Worker then calls plaintiffs telephone while at their front door and after no answer appears to leave a voice message. Defendant social worker present at door, next calls a defendant supervisor or notes that plaintiffs own a big white truck with a big black bumper "that hasn't been here since the first day you guys came out!" This is captured on TPD Body Cam video.*

65. Defendants have knowledge that a vehicle owned by plaintiffs has been missing the entire time since 01/03/19, but this valuable piece of information is not mentioned in defendants Detention Report.

*- On 01/10/19 TPD Officer captures defendant social worker stating at plaintiffs' front door in another attemp to serve plaintiffs with warrant, states, "various social workers been attempting over the weekend"*

66. From 01/03/19, for several consecutive days and weeks thereafter, according to defendants Detention report of 01/16/19, defendants and TPD return to Plaintiffs' home to serve Notice of Entry Order/Warrant but found no one home each time and all hours on different days, finding no one at plaintiffs home.

*- Sometime after 01/03/19 but between that time and 01/16/19, Judge Abdallah states he was in a hurry when he signed the 01/03/19 Order of Entry regarding Plaintiffs and D.A. relays this to defendants.*

---

24

67. On 01/16/19, defendants Piva and Arbuckle met with D.A. David Sant at the D.A.'s office. Mr. Sant speaks with defendants and states that he has spoken with Judge Abdallah who said that he was in a hurry when he signed the 01/03/19 Order. Therefore, Sant tells defendants Piva and Arbuckle that the warrants are to be thrown out and new warrants needs to be prepared for Judge.

*- First Appearance Juvenile Dependency Court Hearing is scheduled for 01/16/19, which Plaintiffs were never served Notice and knew nothing about.*

68. On 01/16/19 a First Appearance Hearing was held in front of Judge Alva. Plaintiffs were not served with notice of this hearing and knew nothing about it as they were out of town on a pre-planned trip.

69. Plaintiffs do not have a transcript of that hearing held on 01/16/19.

70. Plaintiffs have reviewed a Minute Order of 01/16/19, which states social worker, defendant, Piva was present for.

71. Minute Order of 01/16/19 states that Notice has been given, by personal appearance, personal service, certified/first class mail or publication, as required by law. Plaintiffs never received service by any of those means. Defendant Piva was well aware that Plaintiffs were never served at their home as they were out of town, which is not reflected on the Order.

72. The Minute Order of 01/16/19 states that the report of Social Worker and the Petition filed 01/15/19 was read and considered and received into evidence.

73. On 01/16/19, the Court orders, "based on the information before the court" that the minors are to be detained and temporary care and placement of the minor(s) vested with HSA for placement at "MGCS or shelter care".

*- On 01/29/19, Defendants , Piva, together with an unknown HHSA worker, seized Plaintiffs' children at a home address provided by the parents to the court*

25

1  *appointed counsel for minor children, Gabrielle Tetreault.  Piva takes the seizure of*
2  *the children despite knowing that counsel representing children agreed with*
3  *parents that they would not need to seize the children.  Defendants Piva and her*
4  *HHSA accomplice Without a proper Warrant, Without Evidence to Show Exigency,*
5  *and Without Exploring Lesser Intrusive Alternative Means of Ameliorating The*
6  *Speculative Safety Conserns*

7  74.  While still out of town on their pre-scheduled trip, parents learn, just days

8  before 01/29/19 that there is a scheduled Juvenile Dependence Hearing regarding

9  their children which was scheduled for 01/30/19.

10  75.  On Sunday, 01/20/19, paternal grandmother, Roxane, and her friend, who had

11  together gone to plaintiffs' home to give food and water to plaintiffs' dogs the entire

12  time plaintiffs' were out of town, as agreed upon with plaintiffs before they left,

13  found a Minute Order dated 01/16/19, posted on plaintiffs' front door which stated

14  the upcoming hearing of 01/30/19.

15  76.  Paternal grandmother, Roxane, could not immediately reach plaintiffs.

16  77.  The next day, 01/21/19, was a holiday, Martin Luther King, Jr. Holiday and the

17  court was closed.  However paternal grandmother called several attorneys offices on

18  01/21/19 until she found one open.  She wanted to legal advice and information

19  from the Order that apparently came from the D.A.'s office, which was closed for

20  the Holiday.

21  78.  On 01/22/19, Roxane brings the Order she found at plaintiffs' front door to

22  meet with and retain Felicia Morrison, Juvenile Dependency lawyer in San Joaquin

23  County to ask what this notice meant, and what it possibly was all about advising

24  that parents were out of town since 01/03/19 on a pre-planned trip, not knowing

25  anything about this, and not served for anything regarding this notice.

79. On 01/22/19 Attorney Morrison immdiately telephone Tetreault who are colleagues. Attroney Morrison advises that Roxane is in her office after finding the aforementioned Order. Teatreault is on speaker phone and suggested that Lloyd and Stephanie be somehow contacted and place the minors with the maternal grandmother, on 01/29/19 and have the parents show up at the rescheduled next court date on 01/30/19 and the warrants would be recalled, and there would be no need to seize the children. The agreement was confirmed was accomplished exactly as Tetreault relayed.

80. On 01/29/19, children are taken by parents to maternal grandmother and immediately provide the address to Tetreault through a phone from to Morrison.

81. On 01/29/19, despite Tetrault's stated and known agreement with Morrison and parents that there was no need to seize the children once in confirmed maternal grandmothers care, Defendant Piva, along with her HHSA accomplice, immediately shows up at the address provided by parents and seize both children, without conducting reasonable investigation, without evidence to show exigency, and without exploring lesser intrusive alternative means of ameliorating their speculative safety concerns.

82. On 01/29/19, Piva and her HHSA accomplice, stand at the front door of the home where children are with maternal grandmother, never ask to go in, quickly state they have a warrant, and ask that the children be handed to her immediately. This all happens within minutes, and once Piva has possession of the children, she promptly drives away with them. They are taken to Mary Graham Children's shelter then for foster care placement and a medical exam, without parent notification or consent.

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1   83. Immediately when children are seized, paternal grandmother contacts parents
2   and tells them what just happened. Parents are extremely shocked and contact is
3   made with Morrison.

4   84. Morrison immediately contacts Tetreault who is extremely upset over what Piva
5   and her accomplish had just done.

6   85. Parents appear at the 01/30/19 hearing, parents are assigned public defenders.
7   Bench warrants previously issued for minors and parents are recalled. The is matter
8   is continued by Judge Alva to March 6, 2019 at 2:00 p.m. "for Jurisdictional SSW to
9   arrange SUPERVISED visitation as to the PARENTS." Parents are devastated and the
10  horror of the separation from their children and placed in stranger care begins.

11  86. The parents find that the Application and Delcation in Support of Order
12  Authorizing Entry into Home is fraught with known falsehoods by defendants,
13  mischaracterizations of events and facts, outright lies such as, ommissions among
14  other things, service on defendants of Order, knowing that plaintiffs were not home
15  and were told that plaintiffs and children, had left early on 01/03/19 for a pre-
16  planned trip, that plaintiffs had been completely

17  That plaintiffs had been completely cooperative and plaintiffs were cleared of any
18  neglect, purported domestic violence and anything else regarding any incidents with
19  their family and children, including the 12/18/19 incident by TPD who immediately
20  arrived at plaintiffs' home which was captured on his body cam; and which
21  defendant had, the stated "foul smell coming from inside and another baby crying"
22  was unsubstantiated and clearly a lie as verified by the responding officer and his
23  body cam; defendant states "I believe the reporting party to be reliable" which is
24  based on not knowing the RP at all, who could be making the whole story up,
25  defendants do not mention at all that it was approximately 6 minutes from TPD call

28

to arrival of Officer per call reports and officer saw At.B. in mother's arms with dry
hair, dry clothes, and no soiled diaper; defendant Torrence mentions in a DSL and
also "service report" that she had responding Officer's names and phone numbers
but there is no mention that she called any of them regarding any incidents perhaps
because the TPD call reports clear parents of any wrongdoing whatsoever; there is
no mention that when TPD Officer arrived at the plaintiffs' home defendants leave
out that parents are cooperative and bring children out in any other requested time
of neighbor calling; defendants portray information on the 01/03/19 Application and
Declaration as if the police said it and had personal knowledge, when in fact it was
just the call they received from RP and what she said such as ..."on the date of the
incident, December 16, 2018 Tracy Police Department did a Service Report
indicating that "The front door is open to the residence.  Fowl smell coming from
inside and another baby crying."; defedants do not disclose that RP states that she
went inside plaintiffs home when front door was reportedly open, making a
statement that it appeared to be abandoned and was a complete mess, but when
asked, the RP could not describe anything specific in plaintiffs home; and which the
responding TPD, which is also captured on body cam, completely exonerates
plaintiffs of all these lies by RP neighbor; infact defendants do include that TPD
responding officer on 01/02/19 documents that "kids are fine" but then goes on to
state that "there was not a home check conducted" which was not at all accurate.
87.  Defendants include all of the above-referenced mischaracterizations, outright
lies, ommissions, and more, in their 01/16/19 Detention Report which was
apparently filed with the court on 01/15/19.
- Mere days before Plaintiffs trial scheduled in May of 2019, all the while since the
date of seizure of plaintiffs children on 01/29/19 defendants delay, ignore and

29

refuse to place children with immediately approved foster care family members, did County Counsel Alastair Schaefer finally state to plaintiffs counsel who had argued that the Officer's body cam recorded the discrepancy between the RP's statements and the evidence on his video, that she looked at the video footage which she admitted she had all along, of the TPD body cam video, and finally after viewing it admitted that said to plaintiffs counsel she realized the claims made against the parents and of the inside of their house were completely false.

*- After counsel for defendant finally viewed the exclupatory evidence, the day before plaintiffs scheduled trial, which they had all along, county counsel admitted it exonerated parents, the case dismissed at the hearing the next day.*

88. Plaintiffs counsel is called by county counsel the night before plaintiffs' trial and states that if she and HHSA workers could meet within an hour and a half with parents to see where they were living now, hence where the children would be living, they would dismiss the case at the start of trial the next day due to finally viewing the TPD body cam of 12/18/19 that plaintiffs counsel had brought up to her in stating this evidence which they had that should the discrepancy of the reported facts of 12/18/19.

89. Plaintiffs counsel made the 90 minute trip in rush hour traffic and met with county counsel and HHSA workers at parents current residence which was found, clean, well furnished, neatly well stocked, and tidy all around.

*- On 5/14/19 case was dismissed and children finally returned to parents.*

**FIRST CLAIM FOR RELIEF (42 U.S.C. §1983)**

**Violation of Plaintiffs' Rights to Substantive and Procedural Due Process**

**in the Seizure of At.B. and Al.B. (By Plaintiffs Lloyd Thomas Bernhard, II and Stephanie Celeste Tejada-Otero Against Defendants, Sonia Piva and her unknown HHSA accomplice, DOE HHSA Workers 2 –10, and DOES 1 – 50 inclusive)**

90. Plaintiffs restate, and to the extent applicable, incorporate herein each of the foregoing allegations as if set forth herein in full.

91. At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable "child welfare" services agent in Defendants' position and circumstances, as alleged above, would have known that it was unlawful to seize At.B. and Al.B. from the care, custody, and control of Plaintiffs without first obtaining a proper warrant.

92. Defendants refrained from undertaking a reasonable investigation prior to making the decision to seize At.B. and Al.B. from Plaintiffs' care. Moreover, at the time these Defendants, and each of them, made the decision to seize At.B. and Al.B. from their parents' care they knowingly refrained from even considering lesser intrusive alternative means of ameliorating any perceived danger to At.B. and Al.B. In fact, at the time these Defendants seized At.B. and Al.B, there was no evidence in Defendants' possession to suggest that At.B. and Al.B was in immediate danger of suffering severe injury or death at the hands of either of their parents in the short time it would have taken to obtain a court order.

93. Nonetheless, these Defendants, and each of them seized At.B. and Al.B without a proper warrant or other similar court order, under non-exigent circumstances, over Plaintiffs' strenuous objections – all in violation of Plaintiffs' rights arising under the United States Constitution's Fourteenth Amendment.

These Defendants, and each of them, were at all times acting under color of state law when they seized At.B. and Al.B. from Plaintiffs' care, custody, and/or control without a warrant when their was no legal or legitimate basis to do so.

94. Prior to At.B. and Al.B.'s unwarranted seizure, these Defendants, and each of them discussed the proposed unwarranted seizure. As a result of that discussion, each Defendant knew or should have known all facts relevant to their joint decision to forego warrant requirements, including the fact that the child was not under imminent threat of serious bodily harm at the hands of his parents. Moreover, these Defendants, and each of them, knew definitively that At.B. and Al.B were in no danger of suffering severe bodily injury or death in the short time it would have taken for them to obtain a proper warrant. Nonetheless, these Defendants, and each of them, agreed and/or approved of the decision to forgo obtaining judicial authorization prior to seizing At.B. and Al.B. from Plaintiffs' care, custody, and/or control.

95. As a direct and proximate consequence of the aforementioned conduct, Plaintiffs have suffered, and will continue to suffer, damages, including but not limited to economic injury, physical and/or mental anxiety and anguish and emotional distress according to proof at trial.

96. In doing the things alleged herein above, these Defendants, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of the intentional and willful conduct of these defendants in effectuating the knowing and wanton violation of Plaintiffs' constitutional rights, Plaintiffs are entitled to recover punitive damages against these individual defendants in an amount according to proof at trial

**SECOND CLAIM FOR RELIEF (42 USC §1983)**

**Non-Consensual Unwarranted Medical Examinations, Medical Procedures, and Genital Examination (By All Plaintiffs Against S;; Defendants, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive)**

97. Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

98. At all relevant times, the constitutional right to remain free of non-consensual intrusive medical examinations and to make decisions regarding the medical care of one's child has been so "clearly established" that any reasonable HHSA worker in Defendants' circumstances would know that it is a violation of Plaintiffs' constitutional rights to subject their child to a forensic medical examination without just cause, parental consent, or a court order/warrant authorizing the examination. See, Swartwood v. County of San Diego, 2014 U.S. Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014) "[T]he Constitution assures parents, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."]; see also, Mann v. Cty. of San Diego, 907 F.3d 1154, 1163 (9th Cir. 2018).

99. These Defendants, and each of them, violated said rights first when they directed that such an unwarranted forensic/investigational medical examination be performed without first obtaining a proper warrant or knowing and voluntary parental consent; then again when they excluded Plaintiffs from At.B. and Al.B.'s followup medical examinations without any just or legal cause. Finally, All Defendants further violated Plaintiffs' constitutional rights when they, themselves

33

1  performed an examination of At.B. and Al.B. – and took pictures of their body parts

2  for their own purposes.

3  100. In addition to the foregoing, parents also have a guaranteed constitutional right

4  arising from the liberty interest in family association to be with their children while

5  they are receiving medical attention or undergoing medical procedures. Wallis ex

6  rel. Wallis v. Spencer, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). This right includes

7  the right of parents to make important medical decisions for their children. Id. at

8  1141. 214. No reasonable HHSA agent in these Defendants' position could have

9  believed that the above mentioned conduct was lawful or even abstractly justifiable.

10  In fact it was not.

11  101. These Defendants, and each of them, had an affirmative duty and obligation to

12  recognize, acknowledge, and respect Plaintiffs' constitutional rights and to conduct

13  themselves in a manner that confirms to, provides for the preservation of, and does

14  not violate those rights. These rights include, without limitation, the right to privacy,

15  family integrity and the right to remain free of non-consensual unwarranted forensic

16  medical examinations, the right to be present at such examinations absent an

17  affirmative showing of good cause for exclusion, the right to control and participate

18  in medical decisions relative to their children – all arising under the First and

19  Fourteenth Amendments to the United States Constitution.

20  102. These Defendants, and each of them, were acting under color of state law

21  when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional

22  rights by, but not limited to, the performance of unwarranted and non-consensual

23  medical examinations and procedures on Plaintiffs' children.

24  103. As a direct and proximate consequence of said misconduct, Plaintiffs have

25  suffered, and will continue to suffer economic damages as well as but not limited to

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

physical and/or mental anxiety and anguish and other emotional injury according to proof at trial

104. In doing the things alleged herein, these Defendants, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against these individual Defendants, and each of them, according to proof at trial.

## THIRD CLAIM FOR RELIEF (42 USC §1983)

**Deception in The Creation of and/or Presentation of Evidence/False Reporting**

**(By All Plaintiffs All Defendants, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive)**

105. Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

106. The right to familial association guaranteed under the Constitution's Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker and/or child abuse investigator, or other governmental agent, or person acting in an investigatory capacity – including these Defendants, and each of them, would know it is unlawful to continue to detain a child from the care, custody and control of its parents based on knowingly false, and/or based on a juvenile court order which the particular Defendant fraudulently obtained, or caused to be fraudulently obtained.

107. Plaintiffs are further informed and believe and thereon allege that the right of a parent to remain free of the government's fraudulent creation and/or presentation of false, misleading, and/or deceptive, and/or suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these.  Defendants'

35

circumstances would know it is a violation of the constitution to either create, or present deceptive evidence against a parent in juvenile court proceedings. Hardwick v. Cty. of Orange, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate."

108. At all relevant times alleged herein, Defendants, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain, and continue to detain, At.B. and Al.B. from Plaintiffs' custody first by creating false evidence, then later by presenting known materially false, incomplete, and misleading evidence to the Juvenile Court.

109. The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming them both personally and in their relationship with their children, At.B. and Al.B.

110.. These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution – and did violate their rights by, but not limited to: The creation and propagation of false information in

36

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

Defendants' contact notes, Application and Declaration in Support of Order

Authorizing Entry Into Home, and Detention Report with the intention that said

information be incorporated into later Court Reports by others; and then later, by

the making of knowingly false reports of child neglect and child dangerment; the

intentional fabrication of inculpatory evidence by All Defendants, DOE HHSA

Workers 2 - 10, and DOES 1 through 20, inclusive – all knowing and intending that it

would be presented to the Juvenile Court, accepted into evidence, and relied upon

by the juvenile court in making its decisions.

111. The aforementioned misrepresentations and omissions, and others, were

material to the outcome of the Detention Hearing in that, as alleged herein above,

the Juvenile accepted them into evidence and relied upon them in making each and

every one of its findings and orders.

112. The aforementioned conduct by All Defendants, and each of them, was

malicious and had the effect of denying Plaintiffs their right to a fair hearing as well

as their rights to continued custody of their children, At.B. and Al.B., for an

unnecessary and excessive period of time. By spreading lies, maliciously refusing to

provide exculpatory evidence, and presenting fabricated evidence to the Juvenile

Court during the pendency of the dependency proceedings these Defendants, and

each of them, knowingly and intentionally violated Plaintiffs' rights arising under the

First and Fourteenth Amendments to the United States Constitution.

113. As a direct and proximate result of these Defendants' actions Plaintiffs have

suffered and will continue to suffer economic injury, mental and emotional injury as

well as physical manifestations of such mental and emotional suffering, all to an

extent, degree, and amount subject to proof at trial.

114. Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, acted with malice, oppression and fraud or otherwise acted with a willful, wanton, knowing, and conscious disregard for Plaintiffs' rights in a despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing these Defendants, and each of them, in order to deter them, and others similarly situated, from similar such misconduct in the future.

**FOURTH CLAIM FOR RELIEF**

**(42 USC §1983) Malicious Prosecution (By All Plaintiffs Against All Defendants, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive)**

115. Plaintiff incorporates all of the above allegations as though fully set forth herein.

116. At all relevant times, Plaintiffs had a cognizable and constitutionally protected right to familial association.

117. As per the above allegations, Defendant Piva, and her HHSA accomplice, seized At.B. and Al.B. without a proper warrant, in the absence of any exigent circumstance and without first completing a reasonable investigation. She then knowingly inserted false information into her notes and entries thus setting in motion the series of events that ultimately led to the initiation of Juvenile Dependency proceedings.

118. Upon receiving the information from Piva, Defendants all together made the decision to initiate juvenile dependency proceedings by filing their initiating petition.

119. On information and belief, as the Juvenile Dependency case progressed, in

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

consultation with Defendant Piva and with her approval and advice, Defendant Piva continued to press her knowingly false claims against Plaintiffs without probable cause and in an effort to sever their custodial relationship with their children.

120. On information and belief, these Defendants, and each of them, contrived the charges against these Plaintiffs to justify Defendants seizure of At.B. and Al.B., submitted false reports, initiated Juvenile Dependency proceedings in bad faith, and continued to detain At.B. and Al.B. from their parents when there was no legitimate evidentiary basis to do so with the intention of interfering Plaintiffs' constitutionally protected familial rights.

121. In doing the things alleged herein above, these Defendants, and each of them, engaged in intentional, knowing, and malicious misconduct with the purpose of depriving the Plaintiffs of their constitutionally protected right to the custody, care, and control of their children, At.B. and Al.B., – and then continued the dependency proceedings for a prolonged period of time when they knew there was no legitimate basis to do so.

122. Plaintiffs obtained a favorable termination to the proceedings when the Juvenile Dependency case was dismissed in the interest of justice without any jurisdictional finding having been made.

123.. In summary, these Defendants, and each of them, initiated Juvenile Dependency proceedings to stip Plaintiffs of their rights to the care, custody, and control of their children without probable cause with malice through the use of fabricated and false evidence as well as suppressed material exculpatory information..

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1   124. The aforementioned conduct by these Defendants, and each of them, was

2   malicious and had the effect of denying Plaintiffs their right to a fair hearing as well

3   as their rights to continued custody of their children, At.B. and Al.B.., for an

4   unnecessary and excessive period of time. By spreading lies, maliciously refusing to

5   provide exculpatory evidence, and presenting fabricated evidence to the Juvenile

6   Court during the pendency of the dependency proceedings these Defendants, and

7   each of them, knowingly and intentionally violated Plaintiffs' rights arising under the

8   First and Fourteenth Amendments to the United States Constitution.

9   125. As a direct and proximate result of these Defendants' actions Plaintiffs have

10   suffered and will continue to suffer economic injury, mental and emotional injury as

11   well as physical manifestations of such mental and emotional suffering, all to an

12   extent, degree, and amount subject to proof at trial.

13   126. Plaintiffs are informed and believe and thereon allege that Defendants, and

14   each of them, acted with malice, oppression and fraud or otherwise acted with a

15   willful, wanton, knowing, and conscious disregard for Plaintiffs' rights in a

16   despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an

17   award of punitive damages for the purpose of punishing these Defendants, and each

18   of them, in order to deter them, and others similarly situated, from similar such

19   misconduct in the future. FIFTH CLAIM FOR RELIEF (42 USC §1983) Monell Related

20   Claims (By Plaintiffs Against Defendant County of San Joaquin)

21   127. Plaintiff incorporates all of the above allegations as though fully set forth

22   herein.

23   128. Defendant County of San Joaquin, including through its entity HHSA, and those

24   individuals in their official capacity who had supervisory and/or policy making

25   authority, had a duty to Plaintiffs and those similarly situated to establish,

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

implement and follow policies, procedures, customs and/or practices which conform with, and provide for the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, protection of the right to substantive and procedural due process and to be free of unwarranted governmental interference in the custody of their child, C.H. 243. Defendant County of San Joaquin also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within HHSA, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein. Count One Unwarranted Seizure of a Child.

128. Plaintiff incorporates all of the above allegations as though fully set forth herein.

129. Based on the duties charged to the County and delegated to its social workers, including the powers to seize children from their parents' custody, the County knew or should have known of the need to establish policies, practices, and customs required to protect the civil rights of parents and children with whom their agents regularly came into contact – and to adequately train its HHSA workers.

130. At the time of the underlying events, the County's customs and practices relating to the removal of a child from its parent's custody included, but were not limited to: a. The custom and/or practice of removing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury). b. The custom and/or practice of removing children from their parent's custody without first performing a reasonable

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

investigation. c. The custom and/or practice of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation would turn up facts suggesting the seizure was justified. d. The custom and/or practice of continuing the detention of children from their parents in spite of the fact that there was no known legitimate or legal basis to do so. e. The custom and/or practice of requiring a social worker to follow written policies, procedures, and/or practices, when seizing a child from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury. f. The custom and/or practice of requiring a non-offending parent to admit unproven allegations to prevent removal of a child from his or her custody. (See, e.g., Parkes v. Cty. of San Diego, 345 F. Supp. 2d 1071, 1092 (S.D. Cal. 2004).) g. The custom and/or practice of removing children from a parent's custody without consent or a court order, and in the absence of specific, articulable evidence that a particular parent was likely to cause serious physical bodily injury to that child.

131. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to the removal of a child from its parent's custody.

132. When Defendants Piva and her HHSA accomplice, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive, seizedAt.B. and Al.B. from Plaintiffs' custody, they were acting pursuant to and in accordance with the County's child removal customs, polices, and practices. Defendants Piva and her HHSA accomplice, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive, decision to seizure and seizure of At.B. and Al.B. was within the training and standards Defendants received from the County.

1  133. At.B. and Al.B.'s unwarranted seizure and continued unjustified detention from
2  his parents was not an isolated incident. Instead, County social workers and
3  supervisors regularly seize children from their parent's custody without consent,
4  court order, and/or exigency. These past unlawful seizures have resulted in several
5  lawsuits against multiple offending social workers (for violation of constitutional
6  rights) and the County (for its customs being the moving force behind these
7  violations). Thus, the County of San Joaquin is, at minimum, on at least inquiry
8  notice of the existence of a substantial deficiency in its policies, customs, and/or
9  practices.

10  134. Over the years, the County and its employees engaged in similar violations of
11  constitutional rights by seizing children from their parents' custody without consent
12  or a court order, in the absence of exigent circumstances (i.e., imminent danger of
13  serious physical bodily injury). These unlawful seizures have resulted in several
14  lawsuits against multiple offending social workers (for violation of constitutional
15  rights) and the County (for its customs being the moving force behind these
16  violations). Several of these lawsuits ended with substantial settlements.
17  Accordingly, Plaintiffs are entitled to partial summary judgment against [the County
18  Social Worker and Social Worker Supervisor]."

19
20
21
22
23
24
25

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                             **JURY DEMAND**

26     Plaintiffs. Lloyd Bernhard AND STEPHANE and a jury trial as to all issues so

27 triable. OTERO

28

44

FIRST AMENDED COMPLAINT

1

2

## PRAYER

**WHEREFORE**, Lloyd Bernhard and *Stephanie Cleleste Tejada-Otero* pray for judgment against

3    Defendants, and each of them, as to all causes of action, as follows:

4    1.    General damages and special damages according to proof, but in no event less than

5    $1,000,000;

6    2.    As against the individual, human being, Defendants, punitive damages as allowed

7    by law;

8    3.    Attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate

9    statute;

10   4.    Injunctive relief as allowed by law;

11   5.    Such further relief as the Court deems just and proper.

12

Dated: December 30 2022
           12/ 30/ 22

13                                                    *Lloyd Bernhard, II*

14                                              *Stephanie Tejada-Otero*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

45

FIRST AMENDED COMPLAINT