1   Lloyd Thomas Bernhard, II, In Pro Se
    25526 S. Bird Road
2   Tracy, California 95304
    T: (209) 362-8330
3   E: bernhardltb@gmail.com

4   Stephanie Celeste Tejada-Otero, In Pro Se
    25526 S. Bird Road
5   Tracy, California 95304
    T: (209) 362-8330
6   E: redwooodforestt@gmail.com

7   Plaintiffs, In Pro Se

8





JAN – 4 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11   LLOYD   THOMAS   BERNHARD,   II,   An       Case No: 2:21-CV-0172 TLN DB PS
     individual,
12                                               **FIRST AMENDED COMPLAINT**

13   STEPHANIE   CELESTE   TEJADA-OTERO,   An     Claim 1: 42 U.S.C. Section 1983
     individual,                                          (Unwarranted Seizure)
14
                        Plaintiffs,              Claim 2: 42 U.S.C. Section 1983
15                                                        (Coerced/Unwarranted Medical
     Vs.                                                  Examinations and Procedures)
16
     COUNTY OF SAN JOAQUIN, a public entity,     Claim 3: 42 U.S.C. Section 1983
17   SAN   JOAQUIN   COUNTY   HEALTH   AND                (Judicial Deception Unnecessary/
     HUMAN SERVICES AGENCY, a subdivision or              Excessive Duration of Continued
18   entity of THE COUNTY OF SAN JOAQUIN,                 Detention)
     ADRENNA TORRENCE, an individual, LESLIE
19   BILLINGS, an individual, SONIA PIVA, an     Claim 4: 42 U.S.C. Section 1983
     individual, SHANNON BLANKENSHIP, an                  (Malicious Prosecution)
20   individual, DIANE NOWAK, an individual,
     VALESQUEZ – first name unknown, an          Claim 5: *Monell*-Related Claims
21   individual, JASMINE CEJA, an individual,
     ADRIANA CALDERON, an individual, MISTY          - Count One
22   ARBUCKLE, an individual, DANEVIA RHONE,               (Unwarranted Seizures)
     and individual, MARISOL ENOS-SCHAFFER,
23   an individua; YENI GONZALES, an individual,     - Count Two
     DOE   HHSA   Workers   2-10,   known   but          Unwarranted Medical
24                                                        Examinations/Procedures)
25
                                                     - Count Three
                                                          (Judicial Deception)

                            1

unidentified individuals; and DOES 1 through 50, inclusive,

        Defendants

**JURY TRIAL DEMANDED**

## Jurisdiction and Venue

1.    This action is brought pursuant to 42 U.S.C. §1983 to seek redress for Defendants' actions taken under color of law which violated Plaintiffs' rights under the United States Constitution. Defendants' conduct deprived Plaintiffs of their fundamental constitutional rights secured under the United States Constitution's First and Fourteenth Amendments, and under federal law.

2.    Jurisdiction is conferred by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States. This court has supplemental jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. §1367(a).

3.    Venue properly lies in the Eastern District of California, in that the acts and omissions, events and circumstances complained of herein occurred in the County of San Joaquin, and it is believed that at least one defendant resides in the County of San Joaquin.

4.    Plaintiffs make the following allegations and claims upon personal knowledge and belief.

## The Parties

5.     At all times relevant to this Complaint, Plaintiffs Lloyd Thomas Bernhard, II, and Stephanie Celeste Tejada-Otero, were residents of San Joaquin County, California, and the biological parents of a daughter, At.B. (DOB:   4/7/16) and biological parents of a daughter Al.B (DOB:  11/13/17).

6.     The childrens' full names are known to all defendants, and are being withheld herein, unless otherwise ordered by the court, to provide them some level of confidentiality.  The adult Plaintiffs may also be referred to collectively herein as "parents" and/or "plaintiffs."

7.     Prior to the removal of the children from the parents on or about January 29, 2019, as detailed in the Juvenile Dependency Court Records, the parents raised, nurtured, provided guidance, education, and care, for the minor children, in a loving, emotionally, academically and financially supportive, intact nuclear family.

8.     The Plaintiffs' children may collectively be referred to herein on occasion as "the child" or "the children."

9.     Defendant County of San Joaquin ("County") is a public entity of which the San Joaquin County Health and Human Services Agency ("HHSA") is a subdivision.

10.    HHSA is a County governmental agency organized and existing pursuant to the law and policies of defendant County, which together with County, promulgated, encouraged, and/or permitted, the policies, patterns, and practices under which the individual Defendants and Does 1 – 50, committed the acts or omissions complained of herein, and condoned, ratified, and encouraged the conduct of the County employee-defendants, as complained of herein, or failed to train, or inadequately trained the County employee-defendants.

3

11.    At all times relevant to this Complaint, HHSA Worker Adrenna Torrence ("Torrence") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

12.    At all times relevant to this Complaint, HHSA Worker Leslie Billings ("Billings") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

13.    At all times relevant to this Complaint, HHSA Worker Sonia Piva ("Piva") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

14.    At all times relevant to this Complaint, HHSA Worker Shannon Blakenship ("Blankenship") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

15.    At all times relevant to this Complaint, HHSA Worker Diane Nowak ("Nowak") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

16.    At all times relevant to this Complaint, HHSA Worker Valesquez, first name unknown ("Valesquez") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

4

17.   At all times relevant to this Complaint, HHSA Worker Jasmine Ceja ("Ceja") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

18.   At all times relevant to this Complaint, HHSA Worker Adriana Calderon ("Calderon") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

19.   At all times relevant to this Complaint, HHSA Worker Misty Arbuckle ("Arbuckle") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA, and on information and belief was also serving as Worker Sonia Piva's direct supervisor during the time of the events alleged herein. At all relevant times she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

20.   At all times relevant to this Complaint, HHSA Worker Danevia Rhone ("Rhone") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA, and on information and belief was also serving as Worker Sonia Piva, Misty Arbuckle, Marisol Enos-Schaffer, and Yeni Gonzales' direct supervisor during the time of the events alleged herein. At all relevant times she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

21.   At all times relevant to this Complaint, HHSA Worker Marisol Enos-Schaffer ("Enos-Schaffer") was an individual residing in the County of San Joaquin, and an

officer, agent, and/or employee of the County of San Joaquin and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Joaquin in doing the things alleged herein.

22.    At all times relevant to this Complaint, HHSA Worker Yeni Gonzales ("Gonzales") was an individual residing in the County of San Joaquin, and an officer, agent, and/or employee of the County of San Joaquin and HHSA.

23.    At all times relevant to this Complaint, DOE HHSA Workers 2 - 10 were individuals residing in the County of San Joaquin, and officers, agents, and/or employees of the County of San Joaquin and HHSA acting within the course and scope of their duties, under color of law, and pursuant to the regularly established customs, practices, and policies of the County of San Joaquin in doing the things herein alleged. Plaintiffs are ignorant of the true names and capacities of those DOE HHSA Worker Defendants sued herein as DOE HHSA Workers 2 - 10, and for that reason has sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE HHSA Worker Defendants when their identities have been ascertained. Each of the fictitiously named DOE HHSA Worker Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

24.    Hereinafter, when referred to collectively, the Defendants in paragraphs 11 through 23, inclusive, may occasionally be referred to as the HHSA Defendants.

25.    Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Defendant DOES 1 through 50, and for that reason have sued such

1 Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend
2 this Complaint to identify the DOE Defendants when their identities have been
3 ascertained. Each of the fictitiously named DOE Defendants was in some manner
4 liable and legally responsible for the harms sustained by Plaintiffs in that their
5 conduct caused the damages and injuries set forth herein.

6 26.    Plaintiffs are informed and believe and, based upon such information and
7 belief, allege that each of the Defendants is responsible in some manner for the
8 events and happenings referred to herein and was the legal cause of injury and
9 damages to Plaintiffs as herein alleged.

10 27.    Plaintiffs are informed and believe and, based upon such information and
11 belief, allege that, at all times herein mentioned, each and every Defendant was
12 the agent and/or employee of their co-defendants, and each of them, acting at all
13 relevant times herein under color of the authority of governmental entity under
14 the statutes, ordinances, regulations, customs and usage of the State of California
15 and/or the United States Constitution and related laws.

16 28.    Whenever this Complaint makes reference to any act of "Defendants," such
17 allegations shall be deemed to mean all named Defendants, or their officers,
18 agents, managers, representatives, employees, heirs, assignees, customers,
19 tenants, who did or authorized such acts while actively engaged in the operation,
20 management, direction or control of the affairs of Defendants (or any of them) and
21 while acting within the course and scope of their duties, except as specifically
22 alleged to the contrary.

23 29.    At all times relevant to this Complaint, Defendants, and each of them
24 including all DOE Defendants, were the knowing agents and/or alter egos of one
25 another.  Defendants directed, ratified, and/or approved each other's conduct and

7

1   that of each other's agents or employees. Defendants, and each of them including

2   all DOE Defendants, agreed upon, approved or ratified each other's conduct, or

3   otherwise conspired together to commit all of the acts and/or omissions alleged

4   herein.

5   30.  The HHSA Defendants, and each of them, were at all relevant times acting

6   within the course and scope of their duties as employees of the County of San

7   Joaquin.

8   31.   Plaintiffs are informed and believe and, based upon such information and

9   belief, allege that each of the Defendants is responsible in some manner for the

10   events and happenings referred to herein and was the legal cause of injury and

11   damages to Plaintiffs as herein alleged.

12   32.   The HHSA Defendants, and each of them, were at all relevant times acting

13   within the course and scope of their duties as employees of the County of San

14   Joaquin.

15   33.   The HHSA Defendants, and each of them, were at all relevant times acting in

16   conformance with the regularly established customs and practices of the County of

17   San Joaquin.

18   34.   The HHSA Defendants, and each of them, were at all relevant times acting

19   under color of law.

20

21                          **Summary of Allegations**

22   35.   Defendants , Piva, together with an unknown HHSA worker, seized Plaintiffs'

23   children on 1/29/19, in direct contrary to prior arrangements and agreement made

24   between Minors' Court Appointed Counsel, Gabrielle Tetreault, Attorney Felicia

25   Morrison, and parents, that after children were placed with maternal grandmother

---

8

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

1  on 1/29/19, and the address provided by parents to Tetreault on that date, the

2  children would not be seized.  The agreement was that maternal grandmother

3  would be with the children at the home address provided by parents on 1/29/19,

4  parents would be present in court on 1/30/19, as this was the first knowledge they

5  had of a juvenile dependence court appearance referencing their children since

6  they had all been out of town since 1/3/19 for a pre-planned trip.  Parents were

7  not served with a warrant or any notice of any juvenile dependence hearing.  Once

8  parents learned of the 1/30/19 court appearance, they immediately cooperated.

9  Prior to 1/29/19, it was agreed through the court appointed attorney for the minor

10 children, Tetreault, that the children were fine and no seizure of the children would

11 occur, and parents would appear in court on 1/30/19, again, as they had just

12 learned of same.  Prior to Defendant Piva's seizure of children on 1/29/19, she was

13 fully aware that parents were never served with Notice of Hearing or proper

14 warrant.   Prior to 1/29/19, Piva was fully aware of the agreement between

15 Tetreault and parents, however, nevertheless, once Piva obtained the home

16 address for the children on 1/29/19, which parents willingly provided to Tetreault

17 as agreed, defendant Piva immediately arranged for a police escort, that same

18 afternoon on 1/29/19, to meet her at the location parents provided, so that she

19 could seize the children, without first obtaining a legal and/or proper warrant or

20 parental consent and contrary to Minors' Court Appointed Counsel, Tetreault's

21 agreement with parents through Attorney Felicia Morrison. When police officers

22 arrived at the home prior to Piva arriving, they knocked on the door and had a

23 friendly conversation with maternal grandmother stating that they had received a

24 dispatch to wait for the HHSA workers to arrive at the home, and informing

25 maternal grandmother who was startled by their arrival, telling her not to worry

9

everything looks fine and they just probably want to see that the children are here and okay and that's it.  It was not their understanding that defendant Piva or any other HHSA worker was coming to seize the children.  Upon Piva's, together with another HHSA worker's arrival to the address parents provided regarding their children, Piva stood on the outside of the front door of the house where law enforcement also was, demanding of maternal grandmother that she was to immediately hand over the children in her custody while handing her a "warrant" for same.  Piva nor her accomplice, ever asked to come in the home, instead they chose to wait outside the open front door to be handed the children.  Children did not want to go with Piva and were distressed when they had to leave their maternal grandmother's care.  When Tetreault became aware of Piva's actions in the afternoon of 1/29/19, and her seizure of the children, Tetreault was very upset with Piva's independent actions contrary to agreement and promise with parents that their children would not be seized.   Subsequently, Piva communicated and documented that she only received a "tip" as to the location of the children on 1/29/19, inferring their location was received without the parents cooperation. Piva did not document or mention how she received the "tip" or from whom, and intentionally omitted the fact of any involvement or mention of the minors' court appointed Attorney Tetreault was the individual who recommended the arrangements with parents through Attorney Morrison, and agreement regarding the children who were to be with their maternal grandmother on 1/29/19, with parents full cooperation, and a promise that no seizure of the children would occur. On 1/24/19, Piva sent an email to District Attorney Buzo, which states in part, that the HHSA, "As of now, we have had no luck on our end.  I've called the phone numbers on file for the parents and they either go straight to voicemail or are

10

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

disconnected. I've also left a message for the grandmother." Piva does not state the dates or times she called the phone numbers listed on file for the parents, or what those specific numbers were. Piva does not identify which grandmother she "left a message for" and what the message said that was "left" or when or where it was "left." Neither grandmother received a message from Piva. Parents did not receive a message from Piva. Piva goes on to state in her 1/24/19 email to District Attorney Buzo, that in a "routine traffic stop" "grandmother" told the Tracy Police Officer "law enforcement" that "the family left for vacation." Piva further states to D.A. Buzo, "As for the warrants it is my understanding that they are correct for our Agency, but we understand that Law enforcement does not acknowledge them as a viable warrant." Piva and her accomplice, seized the children on 1/29/19, even though they had no evidence to suggest that the children were in immediate danger of sustaining severe bodily injury or death in the short period of time it would normally take to obtain a legal, proper warrant. Piva and her accomplice did these things without first pursuing reasonable means of investigation, and without even thinking to consider lesser intrusive alternative means of ameliorating any perceived threat, real or imaginary, to the Plaintiffs' children. Of note is that on 1/16/19, defendants Piva and Arbuckle met with District Attorney Sant at the D.A. office. Mr. Sant informed defendants, Piva and Arbuckle, that he spoke with Judge Abdallah who had signed the warrant presented to him on January 3, 2019, but thereafter agreed he "was in a hurry" when he signed the Order. It was relayed to the defendants that those warrants were to be thrown out and new warrants would need to be prepared. Plaintiffs are not aware that this was ever done. Again, no warrants were ever served on parents.

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

36.     Once the children were seized and firmly ensconced in the County's "care," Defendant Piva, Torrence and Calderon fabricated material evidence and suppressed material exculpatory evidence in crafting reports which they submitted to the Juvenile Court in order to continue At.B's and Al.B's detention from their parents' custody. Their efforts to mislead the Juvenile Court were effective and resulted in this family being needlessly torn apart and separated for a grossly excessive period of time.

37.     While the plaintiffs' tender age children were in the County's custody, the defendants subjected the children to multiple unwarranted investigatory medical examinations and procedures, and taking of photographs of the children, without the parents' consent, and in at least one instance over the parents' strenuous objections.

38.     This is not the first time the County of San Joaquin and its workers have been sued due to its workers seizing children without just cause, conducting unwarranted medical examinations, and lying to the Juvenile Court in Court Reports. The fact of the matter is that these things happened, and continue to happen, on a fairly regular basis to other families due to San Joaquin County's system wide deliberate indifference to the rights of parents with whom its workers regularly come into contact; and, its deliberate indifference to the need to train and supervise its workers to ensure they adhere to the constitutional mandates that restrict and circumscribe their power to seize children and obtain medical examinations without first obtaining a proper warrant.

## Underlying Facts

### - *Stephanie and Lloyd Get Engaged and Start Their Family*

39.     Stephanie Celeste Tejada-Otero was a student at Lathrop High School where she was an Honor Roll student.   In Jr. High School, she was nominated and voted the School's Student Body President for all of the 8th Grade.  At that time as well, she was the Captain of her Volleyball Team and Caption of her Soccer Team.  Once in High School, Stephanie was a champion swimmer on her High School team. She was on her school's Speech and Debate Team.   Academics and sports were very important to her as she always strived to get good grades, especially straight A's. She enrolled herself in Life Management classes, Photography classes, Culinary classes and Fashion and Design classes.  In fact, she was so advanced and talented in her Fashion and Design class that her teacher would have to customize a more complex class final examination for Stephanie since she had already excelled during the regular school year in the questions and assignments that were previously prepared for the standard class final.   She also enjoyed singing in her Choir class, as well as sewing, cooking, dancing, cosmetology, and interior design.  Due to her family's schedule, she would have to walk the several miles from her family's home to and from her high school each school day. Come rain or shine, Stephanie would indeed walk those several miles each day to and from school, usually alone, with her books and binders in her backpack.  This would entail waking up extra early during the school week, to account for the walking distance and time it would take her to arrive at school on time and get to the classes she so much enjoyed.  Many days, sometimes before school, after school or on the weekends, Stephanie would be in the company of her younger cousins and would enjoy associating with them and frequently volunteering to babysit some of them as well. Stephanie has always had a love of reading and usually you can find her reading a book in her quiet time. She is bilingual and helps interpret whenever needed in any setting. Stephanie has

always had a love for animals and has rescued and nurtured many of them throughout the years. She also participated as a volunteer at an animal shelter and rescue non-profit organization. Her friends and family refer to her as the "animal whisperer" because of her kind and gentle way with animals who respond in kind.

40.     Lloyd Bernhard attended and graduated from Lathrop High School. Lloyd was an Honor Roll Student who was enrolled in Pre A.P. and A.P classes. In addition, Lloyd was a student athlete and was nominated and received his High School Football Team Captain Star and Most Inspirational Player Trophy. In the years growing up, Lloyd played several other sports, including as a Pitcher in Baseball for 7 years, Soccer, Basketball, Wrestling, Karate, Surfing, Diving, Swimming - where he earned his Lifeguard Certification, and he indeed saved the life of a toddler which no one saw, (except for Lloyd), fall in the deepest part of the busy swimming and saved the toddler from drowning. At the age of 3 years old, Lloyd was brought up with a family R.V. and was constantly going on family outings and vacations. In Junior High School Lloyd was nominated, unbeknownst to him, by one of his teachers as a United States Student Ambassador. Thereafter, through quite a thorough process of collection of background information regarding character, academic records, and interviews with Lloyd and those around him, he was selected as a United States Student Ambassador to France, Italy and Greece which prior to a 21 day oversees stay in each country, he together with 21 other Student Ambassador's selected throughout the U.S., met monthly for one year, to learn each selected visiting country's government, language, (he studied and spoke the French language for 2 years), customs, and so forth, because at the end of that year's studies the 21 students would then travel together, with educators, to those specific selected countries to meet and associate with other students just like them

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

in another part of the world. The U.S. Student Ambassadorship was started by President Dwight Eisenhower with the hopes that if students who display positive leadership qualities as youth, and learn about other counties in their youth, and actually travel to those lands and meet those youth personally, they will see, they are just like them, so when they grow up, it will bring "peace through understanding." Lloyd was first selected as a U.S. Student Ambassador in Junior High School because of his perfect score on the California State STAR test and because of his positive leadership qualities. After his first successful Ambassadorship to France, Italy and Greece, Lloyd was again nominated and selected, this time as a U.S. Student Ambassador to Australia. Again, Lloyd went through the same rigorous process over the year prior to traveling to Australia, and while in Australia, he donated his own funds to provide protection for the natural roaming of native Australian tortoises who swim/cruise in the Great Barrier Reef, where he also scuba dived with them and other sea life while there. Lloyd cooked and ate with the native aborigines, cuddled with Koalas, enjoyed the wild troops of kangaroos, and played sports with Australian students, visited their homes, and their government offices, and much more. Lloyd longed to teach his own children one day, the same values and principles he espoused and wished to encourage the same understanding and experiences toward whatever his children would find interesting to them.

41.     Stephanie and Lloyd met in 2015, while they were students in the same Choir Class in High School. Lloyd especially enjoyed Wednesdays in school because that was always the day Stephanie would have her culinary class and after school would bring Lloyd something special and very tasty that she had prepared for him to eat. Through their choir class, they both would volunteer to participate in performing

in the community Tree Lighting Ceremony, parades, fall concerts and more. Lloyd and Stephanie maintained a friendship throughout this time. They often would serve meals to the homeless, participate in a school Veteran's Breakfast and Lloyd personally wrote to a known Holocaust Survivor, Liz Igra, and arranged to have her travel to his high school, she accepted his heartfelt invitation. Lloyd met Mrs. Igra on stage in front of a packed indoor High School theater, introducing her to all in attendance, giving her a warm welcome and presenting her with a huge beautiful bouquet of flowers. Mrs. Igra gave a very moving speech and presentation to his entire high school regarding her personal experience during the Holocaust. Over time, Lloyd and Stephanie's friendship matured into something more serious. Stephanie studied for and earned her Cosmetology Certificate. She sought employment at Alta Beauty and Cosmetic Store and was selected to join their team, which she eagerly did and thrived. Stephanie also started her own business as a special event planner and choreographed her own music and taught dance routines for such events. After High School, Lloyd worked for the school district, and also pursued his passion and enjoyment of automobiles and working on them. Stephanie and Lloyd became engaged in 2016, and moved in together in their own quaint 3 bedroom residence.

### - Stephanie and Lloyd Decide to Have a Baby

42. Stephanie and Lloyd wanted to have a child together. They had secure employment, their own nice, clean and tidy residence, and had family nearby. When Stephanie became pregnant, they could hardly wait for their daughter to be born. They were so excited to meet her, love her, care for her and introduce her to family and friends. On April 7, 2016, At.B. was born, fully developed and healthy in the hospital with all family around. They felt blessed with their new little sweet

daughter. They were a loving family. Lloyd and Stephanie carefully chose their daughter's name which had a meaning of the Greek Goddess of Wisdom, always accompanied by her owl and the goddess of victory. They wanted this name as a powerful inspiration for their baby daughter. Lloyd had visited Athens while in Greece prior to At.B. being born. From the moment At.B. was born, Lloyd and Stephanie doted on her, as did their entire families and friends. Paternal grandmother, along with others, were indeed stationed outside their hospital room, before, during and after At.B.'s birth. Lloyd and Stephanie had everything ready at their home for their arriving newborn little girl, and had, prior to her birth, decorated their daughter's own room at home, complete with a brand new crib, stuffed animals and child decorations around the room, rocking chair, baby monitors, sweet clothing, and plenty of baby supplies and a special poster on the wall with their daughter's name spelled out in large beautiful, colorful flowers. They also had purchased the best and most secure car seat for their newborn which they did a lot of research on and brought it with them to the hospital to place their daughter in after her birth to safely ride home in.

43. Lloyd and Stephanie followed the recommendations for their daughter's sleep and feeding schedule. Prior to their daughter's birth, they did their own research and reading, regarding newborn's needs. Due to the well recognized health benefits of breast feeding, in consultation with their medical provider, Lloyd and Stephanie made the decision to breast feed At.B.

44. At.B.'s typical day would start at about 7:00 a.m. when feeding would occur at that time and throughout the day. Upon At.B.'s waking, Stephanie and/or Lloyd would change their daughter out of her pajamas and diaper if it was wet. After feeding and diaper changing. At.B. would have tummy time on her cushioned baby

17

floor mat with mommy and/or daddy baby talking with her.  Lots, and lots of pictures of At.B. were frequently taken with sweet pride.  There was also time in her upright secure baby bouncer seat.  Throughout the day, Stephanie and Lloyd securely placed At.B. in the Babybjorn Baby Carrier against their front chest.  Both Stephanie and Lloyd would routinely and lovingly talk and sing to At.B.

45.  The rest of At.B.'s day was similarly structured with everything from playtime to nap time being scheduled as recommended by child rearing professionals. Feeding and naps were timely and At.B. was always well fed, cleaned, rested, and loved. At.B.'s day would start winding down around 5:25 p.m., thereafter she was brought to her bassinet to get ready for bedtime.

46.  At.B. continued to flourish, in good health and proper care, lots of love and constant family association.

47.  When At.B. was about a year old, Lloyd and Stephanie and At.B. resided in a beautiful well kept, large 2-Story, 4 bedroom home with a well maintained backyard in Tracy, California.  Paternal grandmother, Roxane, and, paternal uncle, Randy, resided together with Lloyd Stephanie and At.B., as well.

### - Stephanie and Lloyd Decide to Have another Baby

48.  Stephanie and Lloyd decide to have another baby and give At.B. a sibling. At.B. is now about a year and a half old, and Al.B., a sister, is born on November 13, 2017.  Everyone is ecstatic with the blessing of this new well developed, healthy baby girl.  At.B. dotes over her newborn little sister as do Stephanie, Lloyd, Paternal Grandmother, Roxane, and Paternal Uncle, Randy, along with all other visiting family members and friends.  Their new daughter's name is also carefully chosen, which relates to love, honesty, creativity, success, and in addition she is given a beautiful middle name which honors her well loved Great Grandmother.  Parents

18

1  incorporate At.B. with their daily routine alongside her sister, with specific
2  consideration and attention to their newborn's needs and schedule.  At.B. is a
3  sweet, happy baby, enjoying an abundance of family love and attention.  Lots of
4  pictures are taken of the children and the whole family together.  They are now a
5  loving, happy family of four.

6     *- On December 16, 2018, At.B. finds her way through the front door of her*
7  *home, and within minutes therefrom, reportedly steps onto the neighborhood*
8  *street while her mother is taking a few quick moments, while both children were*
9  *napping upstairs, to give food and water to their family dogs who are in their*
10 *backyard.*

11 49.  December 16, 2018, was just like any other day. Family rises in the morning,
12 parents go to crib where At.B. is waking up, Stephanie meets her with a warm smile,
13 a "good morning" greeting as usual, and picks her up out of her crib all the while
14 cuddling her.  Next, little sister, Al.B., is just starting to wake up as well in her
15 bassinet. Lloyd gently picks her up out of her bassinet, she is also met with a warm
16 smile from dad and a "good morning" greeting followed by a warm hug. Lloyd and
17 Stephanie happily tend to At.B. and Al.B, changing diapers and pajamas. The family
18 goes downstairs together and breakfast is properly prepared and children are
19 promptly and appropriately fed breakfast. Thereafter, the morning was normal and
20 uneventful.

21 50.  Parents spent the day with At.B. and Al.B. at home.  In the early afternoon,
22 of December 16, 2018, Lloyd makes a trip to the store for items needed. Children
23 are at home with Stephanie, playing, then taking nap time accordingly. While Lloyd
24 is at the store, sometime before 3:08 p.m., and while Stephanie was at home with
25 the children and had the children down for a nap, At.B. wakes up,  finds her way

1   through the front door of her home, and within minutes therefrom, reportedly, by

2   neighbor, steps onto the neighborhood street while Stephanie is taking a few quick

3   moments to give food and water to their family dog in their backyard. Stephanie

4   only goes out momentarily to feed the dogs in the backyard while At.B. and Al.B.

5   are napping.

6   51.  Within seconds of stepping back in their house from just giving the family dogs

7   food and water in their backyard, Stephanie immediately notices that their front

8   door is open and when she walked through the front door to investigate, she saw

9   At.B. being held by a lady standing right next to Stephanie's garage door holding

10  At.B.  Stephanie immediately asks what's going on.  Upon seeing Stephanie who

11  had just approached her, this unknown lady starts yelling at Stephanie and being

12  very rude.  At the same time, Stephanie sees and hears the lady next door standing

13  in her yard who also begins screaming at Stephanie shouting derogatory comments

14  at her.  Stephanie reaches for her child At.B., and takes At.B. out of the arms of an

15  unknown lady that is standing next to her garage door.  Unknown lady does not

16  resist. With At.B. securely in Stephanie's arms, she tells both the unknown lady and

17  neighbor lady who are still screaming at her, to leave her alone, Stephanie does not

18  engage in an argument, and proceeds to walk into her own house with her daughter

19  in her arms and shuts the front door to her home.

20  52.  Of note, the shouting neighbor lady had recently moved in next door with her

21  parents while she was currently in the middle of a custody battle over her young

22  son, and divorce proceedings.  When she confronted Stephanie screaming, telling

23  her that some unknown person driving by, saw At.B. in the street in front of

24  Stephanie's house but knocked on the neighbor's front door asking if she knew this

25  child, she continued screaming terrible insults to Stephanie in the front yard. There

20

1   is a history of problems coming from the plaintiffs' neighbor, the reporting party to

2   TPD prior to the incident on 12/16/18. This same neighbor lady is constantly heard

3   publicly, loudly and caustically arguing with other people at various other times,

4   including doing same every time her soon to be ex-husband, who she screams

5   outside her parent's home at, that she is in the process of divorcing him, and lives

6   elsewhere, as he drops off their young son for her visitation time with their child.

7   As well, this neighbor's teenage resident, is also heard screaming and pacing on the

8   outside sidewalk, on numerous occasions, telling everyone around that he wants

9   to "kill" himself.   On another occasion, Lloyd and Stephanie called TPD on those

10  very same neighbors who for no reason at all, put a knife through their adjoining

11  backyard fence and stabbed their family dog, having Lloyd and Stephanie rush the

12  dog to the vet for care and stitches, which Stephanie and Lloyd report to and

13  presented to TPD. As well, it was reported, after sightings, that this same screaming

14  neighbor lady would go around outside at the early dark morning hours ringing

15  neighbor doorbells and running away before the door was answered, just to cause

16  trouble.   Lloyd and Stephanie kept their distance from that lady because of her

17  caustic and bizarre behavior.   However, Lloyd and Stephanie, got along well with

18  the other neighbors who had lived around them when Lloyd and Stephone moved

19  in that neighborhood.   Those neighbors would frequently be invited to gatherings

20  hosted by and held at Lloyd and Stephanie's home as well as neighborhood children

21  invited to birthday parties for Lloyd's children at their home as well, where fun and

22  good times were had by all.

23  53. On 12/16/18 shortly after the initial call from plaintiffs' neighbor to TPD, about

24  5-6 minutes later, a TPD Officer arrived at Stephanie's front door and knocked on

25  it. At the time the TPD Officer arrived, the confrontational next door neighbor and

the unknown person in the car had gone.  The Tracy Police Department Calls For Service Report documented the following: "Date: 12/16/18 Time: 15:08:08 2YR OLD FEMALE WAS RUNNING AROUND OUTSIDE...WENT INSIDE"  at about 5 minutes after initial call, TPD officer arrives at plaintiffs home for a "WELFARE CHECK" TPD Officer goes to Stephanie's front door and knocks. Stephanie cordially answers the door and proceeds to have an amicable conversation with this Police Officer.  He explains why he was there and Stephanie said those people were rude and that she did not know how her child had gotten out and invited the Officer to come in. Lloyd had not yet arrived back home from the store.   Stephanie proceeds to invite the TPD Officer to come in her home.  TPD Officer tells Stephanie it is not necessary for him to come in but she insists.  The Officer did so, and his body camera caught a partial sweep of the entryway to the home and the nearby dining room area which captures a clean, neat, tidy, well kept and furnished home.  He sees the doorknob on the inside of the front door which had a child safety mechanism attached to that front doorknob that would have kept At.B. from even turning the knob from the inside. He sees the child gate at the bottom of the stairs. At.B. is in Stephanie's arms, quiet and happy.  He asks Stephanie where is their other child and she proceeds to tell him she is upstairs napping and offers to take him up to her room to see her. The TPD officer says that is not necessary since the child is sleeping. TPD Officer tells Stephanie not to worry "this happens all the time with children" and proceeded to tell her that this had happened with his own children. Officer sees At.B., observes the home, hears no crying by Al.B. and at the time of "15:29:39" the TPD Service Report documents "KIDS ARE FINE" - "15:29:53 PER #C11" - "15:32:41 Closed dispo : SERVICE RENDERED."

54.  Sometime thereafter, Lloyd returns home from the store and Stephanie proceeds to let him know what happened while he was gone.

   *- On January 2, 2019, 18 days after the December 16, 2018 incident, HHSA worker Torrence arrived at the plaintiffs residence, knocks on their front door and when Stephanie answers the door, and steps out to speak with Torrence, Torrence advises her she is there to conduct an unnounced home visit stating she is following up on the December 16, 2019 incident.  Stephanie advises Torrence that children are sleeping inside their home at the time of her arrival.  Stephanie invites Torrence to come back and relays that an appointment can be made within a week or two, for her to return at a time when the children are awake.*

55.  On January 2, 2019, 18 days after the December 16, 2018 incident, HHSA worker Torrence arrived at the plaintiffs residence and knocks on their front door.

56. Stephanie answers door and steps outside when Torrence arrives at her home on 1/02/19..

57.  Torrence states to Stephanie she is there as a follow up to the 12/16/18 incident, albeit 18 days later.

58. Stephanie tells Torrence the children are sleeping and asks if she can make an appointment with Stephanie and the children to come back in a week or two at a time when they are awake.  Torrence quickly became combative and refused Stephanie's request, said she could make an appointment to come back, but not in a week or two, and she proceeds to stomp off.

   *- On 01/03/19, unbeknownst to Plaintiffs because earlier that day they had all left for a pre-planned trip, but according to the 1/16/19 Detention Report, "at approximately 10:30 a.m." Torrence quickly sought and received a signed Order for Entry by Judge Abdallah.*

59. On 1/03/19, at 10:30 a.m. Torrence received a signed Order for Entry by Judge Abdallah.

60. Plaintiff's do not have, at this time, the transcript of the 1/03/19 proceeding as to what was told to Judge Abdallah by defendants in order to secure his execution of an Order for Entry to be served on Plaintiffs. Plaintiffs will request this and other items and testimony during the discovery process of this case.

    - **Tracy Police Department Bod Cam Footage:**

    - *On 1/03/19 "at approxiimately 11:00a.m." according to the 01/16/19 Detention Report, "SW Torrence and SW Velasquez  arrived at the residence for an unannounced home visit.  Torrence knocked on the door several time [sic] to no answer."*

61.   On **1**/03/19, at 11:00 a.m. defendant Torrence returns with defendant Velasquez accompanied by TPD to serve Order of Entry on Plaintiffs.  Torrence knocks several times on front door of plaintiffs' home and there is no answer.

62. On 1/03/19, TPD Body Cam video captures a TPD Officer stating to defendants, "He may not be here cuz his truck's not here."

63. On 1/03/19 with Torrence and Velasquez still at plaintiffs' front door, TPD Body Cam video captures who appears to be defendant Velasquez stating "usually" the Order/Warrant is only good for 24 hours.

64. On 1/03/19, in speaking with Torrence and Velasquez, TPD Body Cam video captures TPD Officer speaking with one of the defendant social workers who states, "We don't have that they are in danger right now, cuz we haven't gotten in."

65. On 1/03/19 in speaking with Torrence and Velasquez, TPD Body Cam video captures TPD Officer asking defendants Torrence and Velesquez while still outside Plaintiff's home to serve Order/Warrant for Entry, "So your main goal is just to get

in the house check on the kids and look at the inside of the house." Defendants

reply, "Yeah".

- **Tracy Police Department Body Cam Footage:**

- *On 1/06/19 TPD Officer is at plaintiffs front door, and in speaking with defendant social workers who are present outside Plaintiff's home as well to serve Order/Warrant for Entry, states that he has been there the day before and one day before that. Defendant Social Worker then calls plaintiffs telephone while at their front door and after no answer appears to leave a voice message. Defendant social worker present at door, next calls a defendant supervisor or notes that plaintiffs own a big white truck with a big black bumper "that hasn't been here since the first day you guys came out!" This is captured on TPD Body Cam video.*

66. Defendants have knowledge that a vehicle owned by plaintiffs has been missing the entire time since 1/03/19, but this valuable piece of information is not mentioned in defendants Detention Report.

- *On 1/10/19 TPD Officer captures defendant social worker stating at plaintiffs' front door in another attempt to serve plaintiffs with warrant, states, "various social workers been attempting over the weekend"*

67. From 1/03/19, for several consecutive days and a couple of weeks thereafter, according to defendants Detention report of 1/16/19, defendants and TPD return again to Plaintiffs' home in continuous attempts to serve Notice of Entry Order/Warrant but found no one home each time and all hours on different days, finding no one at plaintiffs' home.

- *Sometime after 1/03/19 but between that time and 1/16/19, Judge Abdallah states he was in a hurry when he signed the 1/03/19 Order of Entry*

*regarding Plaintiffs and D.A. relays this to defendants and that the warrants are to be thrown out.*

68.   On 1/16/19, defendants Piva and Arbuckle met with D.A. David Sant at the D.A.'s office.  Mr. Sant speaks with defendants and states that he has spoken with Judge Abdallah who said that he was "in a hurry" when he signed the 1/03/19 Order.  Therefore, Sant tells defendants Piva and Arbuckle that the warrants are to be thrown out and new warrants needs to be prepared for Judge.

   *- First Appearance Juvenile Dependency Court Hearing is scheduled for 1/16/19, which Plaintiffs were never served Notice and knew nothing about.*

69.   On 1/16/19 a First Appearance Hearing was held in front of Judge Alva. Plaintiffs were not served with notice of this hearing and knew nothing about it as they were out of town on a pre-planned trip.

70.  Plaintiffs do not have a transcript of that hearing held on 1/16/19 but plan to obtain through discovery of this case.

71.  Plaintiffs have reviewed a Minute Order of 1/16/19, which documents social worker, defendant, Piva was present for.

72.   Minute Order of 1/16/19 states that Notice has been given, by personal appearance, personal service, certified/first class mail or publication, as required by law.  Plaintiffs never received service by any of those means.  Defendant Piva was well aware that Plaintiffs were never served at their home as they were out of town, which is not reflected on the Order.

73.  The Minute Order of 1/16/19 states that the report of Social Worker and the Petition filed 1/15/19 was read and considered and received into evidence.

74. On 1/16/19, the Court orders, "based on the information before the court" that the minors are to be detained and temporary care and placement of the minor(s) vested with HSA for placement at "MGCS or shelter care".

 *- On 1/29/19, Defendants , Piva, together with an unknown HHSA worker, seized Plaintiffs' children in direct contrary to defendants known prior arrangements, agreement and promise, made between Minors' Court Appointed Counsel, Gabrielle Tetreault, Attorney Felicia Morrison, and parents, that after children were placed with maternal grandmother on 1/29/19, and the address provided by parents to Tetreault on that date, the children would not be seized. Nevertheless, Defendants Piva and her HHSA accomplice, Knowning of the aforementioned agreement and promise made to parents that their children would not be seized, and Without a proper Warrant, Without Evidence to Show Exigency, and Without Exploring Lesser Intrusive Alternative Means of Ameliorating The Speculative Safety Conserns still, seized Plaintiffs' chiildren on 1/29/19, at the doorstep of the home the children were previously arranged to be in the care of the Plaintiffs' children with maternal grandmother.*

75. While still out of town on their pre-scheduled trip, parents learn, just days before 1/29/19 that there is a scheduled Juvenile Dependence Hearing regarding their children which was scheduled for 1/30/19, which they knew nothing about.

76. On Sunday, 1/20/19, paternal grandmother, Roxane, and her friend, who had together regularly gone to plaintiffs' home to give food and water to plaintiffs' dogs the entire time plaintiffs' were out of town, as agreed upon with plaintiffs before they left, found a Minute Order dated 1/16/19, posted on plaintiffs' front door which stated the upcoming hearing of 1/30/19.

77. Paternal grandmother, Roxane, could not immediately reach plaintiffs.

78. The next day, 1/21/19, was a Federal holiday, Martin Luther King, Jr. Holiday and the court was closed.  However paternal grandmother called several attorney's offices on 1/21/19 until she found one open.  Since she did not know what was going on, she wanted legal advice, explanation and information from the Order she found on plaintiffs' door, while they were out of town, that apparently came from the D.A.'s office, which was closed for the Federal Holiday as well.

79. On 1/22/19, Roxane brings the Order she found at plaintiffs' front door to meet with and retain Felicia Morrison, Juvenile Dependency lawyer in San Joaquin County to ask what this notice meant, and what it possibly was all about advising that parents were out of town since 1/03/19 on a pre-planned trip, not knowing anything about this, and not served for anything regarding this notice.

80.  On 1/22/19 Attorney Morrison immediately telephoned Tetreault who are colleagues.   Attorney Morrison states to Tetreault that paternal Grandmother Roxane, immediately contacted her after finding the aforementioned Order on plaintiffs' front door on 1/20/19, while Plaintiffs' are out of town on a pre-planned trip, and that Roxane is in her office with the Notice wanting to know what is going on and what to do because parents are still out of town clearly not knowing anything about this Notice and parents could not be readily reached. Tetreault is told she is on speaker phone in Morrison's office with Roxane present. Tetreault suggested that Lloyd and Stephanie be somehow contacted and place the minors with the maternal grandmother, on 1/29/19, and have the parents show up at the rescheduled next court date on 1/30/19 and the bench warrants would be recalled, and there would be no need to seize the children. The agreement was confirmed was accomplished exactly as Tetreault relayed.

28

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

81.  On 1/29/19, children are taken by parents to maternal grandmother and immediately provide the address to Tetreault through a telephone call from Morrison, exactly as agreed.

82.  On 1/29/19, despite Tetreault's stated and known agreement with Morrison and parents that there was no need to seize the children once in confirmed maternal grandmothers care, Defendant Piva, along with her HHSA accomplice, immediately showed up at the address provided by parents and seize both children, without conducting reasonable investigation, without evidence to show exigency, and without exploring lesser intrusive alternative means of ameliorating their speculative safety concerns.

83. On 1/29/19, Piva and her HHSA accomplice, stand at the front door of the home where children are with maternal grandmother, never ask to go in, quickly state they have a warrant, and ask that the children be handed to her immediately with their belongings.  This all happens within minutes, and once Piva has possession of the children, she promptly drives away with them.  They are taken to Mary Graham Children's shelter then for stranger foster care placement and a medical exam, without parent notification or consent.

84.  On 1/29/19, immediately when children are seized, maternal grandmother contacts parents and tells them what just happened.  Parents are extremely shocked and immediate contact is made with Morrison.

85. On 1//29/19, Morrison immediately contacts Tetreault who is extremely upset over what Piva and her accomplice had just done in seizing the children.

86.  Parents appear at the 01/30/19 hearing, parents are assigned public defenders. Bench warrants previously issued for minors and parents are recalled.  The matter is continued by Judge Alva to March 6, 2019 at 2:00 p.m. "for Jurisdictional SSW to

1   arrange SUPERVISED visitation as to the PARENTS." Parents are devastated and the
2   horror of the separation from their children and placed in stranger foster care
3   begins.

4   87.  The parents find that the Application and Declaration in Support of Order
5   Authorizing Entry into Home is fraught with known falsehoods by defendants,
6   mischaracterizations of events and facts, outright lies, omissions, among other
7   things, service on defendants of Order, knowing that plaintiffs were not home and
8   were told that plaintiffs and children, had left early on 1/03/19 for a pre-planned
9   out of town trip, that plaintiffs had been completely cooperative whenever
10  contacted, and plaintiffs were cleared of any neglect, purported domestic violence
11  and anything else regarding any incidents with their family and children, including
12  the 12/18/19 incident by TPD who immediately arrived at plaintiffs' home which
13  was captured on his body cam; and which defendants had, the stated "foul smell
14  coming from inside and another baby crying" was unsubstantiated and clearly a lie
15  as verified by the responding TPD Officer and his body cam; defendant states "I
16  believe the reporting party to be reliable" which is based on not knowing the RP at
17  all, who could be making the whole story up, defendants do not mention at all that
18  it was approximately 5- 6 minutes from TPD call to arrival of Officer per call reports
19  and Officer saw At.B. in mother's arms with dry hair, dry clothes, and no soiled
20  diaper; defendant Torrence mentions in a DSL and also "service report" that she
21  had responding Officer's names and phone numbers but there is no mention that
22  she ever called any of them regarding any incidents perhaps because the TPD call
23  reports clear parents of any wrongdoing whatsoever; there is no mention that
24  when TPD Officer arrived at the plaintiffs' home defendants leave out that parents
25  are cooperative and bring children out in any other requested time of neighbor

30

calling; defendants portray information on the 1/03/19 Application and Declaration as if the police said it and had personal knowledge, when in fact it was just the call they received from RP and what she said such as ..."on the date of the incident, December 16, 2018 Tracy Police Department did a Service Report indicating that "The front door is open to the residence. Fowl smell coming from inside and another baby crying."; defendants do not disclose that RP states that she went inside plaintiffs home when front door was reportedly open, making a statement that it appeared to be abandoned and was a complete mess, but when asked, the RP could not describe anything specific in plaintiffs home; and which the responding TPD Officer did not observe any of these allegations from RP, which is also captured on his body cam, completely exonerates plaintiffs of all these lies by RP neighbor; in fact, defendants do include that TPD responding officer on 12/16/18, documents that "kids are fine" but then goes on to state that "there was not a home check conducted" which was not at all accurate as referenced above.

88. Defendants include all of the above-referenced mischaracterizations, outright lies, omissions, and more, in their 1/16/19 Detention Report which was apparently filed with the court on 01/15/19.

- Mere days before Plaintiffs trial scheduled in May of 2019, all the while since the date of seizure of plaintiffs' children on 1/29/19 defendants delay, ignore and refuse to place children with immediately approved foster care family members, instead keeping children in stranger foster care, where they were moved at least once, without telling parents. Only after plaintiffs' counsel had argued with County Counsel that the Officer's body cam of 12/16/19 had captured and recorded the discrepancy between the RP's statements and the evidence on his video, that finally County Counsel Alastair Schaefer finally called plaintiffs' counsel, Robert

Powell, in San Jose, in the late afternoon the day before the scheduled morning trial, did she state that she finally looked at the video footage which she admitted she had all along, of the TPD body cam video, and finally after viewing it, admitted and said to plaintiffs counsel Powell that she realized the claims made against the parents by RP and of the inside of their house were completely false.

*- After counsel for defendant finally viewed the exculpatory evidence, the late afternoon before plaintiffs scheduled trial, at the insistence of plaintiff's attorney Powell, which County and defendants had exculpatory evidence all along, county counsel Schaefer admitted that the TPD body cam footage on 12/16/19 exonerated parents, and the case would be dismissed at the hearing the next day.*

89.  On 5/13/19. Plaintiff's counsel Robert Powell, is called by county counsel the late afternoon before plaintiffs' trial set for the next morning 5/14/19, and states that if she and HHSA workers could meet within an hour and a half with Mr. Powell and parents, to see where they were now living, and where the children would be living after release the next morning, county counsel would immediately dismiss the case at the scheduled court hearing 5/14/19, from HHSA aforementioned seizure since 1/29/19. County confirmed with Powell that due to her finally viewing the TPD body cam of 12/18/19 that plaintiff's counsel had previously brought up to her and defendants, in stating this evidence which County had all along, that showed the discrepancy of the reported facts of 12/18/19, she agreed this case should be and would be dismissed on 5/14/19.

90.  On 5/13/19, Plaintiff's counsel, Powell made the 90 minute trip in rush hour traffic and met with parents, county counsel and HHSA worker at parent's current

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

residence which was found, clean, well furnished, neatly well stocked, and tidy all around.

- *On 5/14/19 Juvenile dependance case against plaintiffs was dismissed and children finally returned to parents after HHSA improper, illegal and in direct contrary to Defendants agreement and promise with parents prior to the 1/29/19 seizure of their children.*

**FIRST CLAIM FOR RELIEF (42 U.S.C. §1983)**

**Violation of Plaintiffs' Rights to Substantive and Procedural Due Process in the Seizure of At.B. and Al.B.**

**(By Plaintiffs Lloyd Thomas Bernhard, II and Stephanie Celeste Tejada-Otero Against Defendants, Sonia Piva and her unknown HHSA accomplice, DOE HHSA Workers 2 –10, and DOES 1 – 50 inclusive)**

91. Plaintiffs restate, and to the extent applicable, incorporate herein each of the foregoing allegations as if set forth herein in full.

92. At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable "child welfare" services agent in Defendants' position and circumstances, as alleged above, would have known that it was unlawful to seize At.B. and Al.B. from the care, custody, and control of Plaintiffs without first obtaining a proper warrant.

93. Defendants refrained from undertaking a reasonable investigation prior to making the decision to seize At.B. and Al.B. from Plaintiffs' care. Moreover, at the time these Defendants, and each of them, made the decision to seize At.B. and Al.B. from their parents' care they knowingly refrained from even considering lesser intrusive alternative means of ameliorating any perceived danger to At.B. and Al.B.

In fact, at the time these Defendants seized At.B. and Al.B, there was no evidence in Defendants' possession to suggest that At.B. and Al.B was in immediate danger of suffering severe injury or death at the hands of either of their parents in the short time it would have taken to obtain a proper court order.

94. Nonetheless, these Defendants, and each of them seized At.B. and Al.B without a proper warrant or other similar court order, under non-exigent circumstances, over Plaintiffs' strenuous objections – all in violation of Plaintiffs' rights arising under the United States Constitution's Fourteenth Amendment. These Defendants, and each of them, were at all times acting under color of state law when they seized At.B. and Al.B. from Plaintiffs' care, custody, and/or control without a proper warrant when there was no legal or legitimate basis to do so.

95. Prior to At.B. and Al.B.'s unwarranted seizure, these Defendants, and each of them discussed the proposed unwarranted seizure. As a result of that discussion, each Defendant knew or should have known all facts relevant to their joint decision to forego warrant requirements, including the fact that the children were not under imminent threat of serious bodily harm at the hands of their parents. Moreover, these Defendants, and each of them, knew definitively that At.B. and Al.B were in no danger of suffering severe bodily injury or death in the short time it would have taken for them to obtain a proper warrant. Nonetheless, these Defendants, and each of them, agreed and/or approved of the decision to forgo obtaining proper judicial authorization prior to seizing At.B. and Al.B. from Plaintiffs' care, custody, and/or control.

96. As a direct and proximate consequence of the aforementioned conduct, Plaintiffs have suffered, and will continue to suffer, damages, including but not

limited to economic injury, physical and/or mental anxiety and anguish and emotional distress according to proof at trial.

97. In doing the things alleged herein above, these Defendants, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of the intentional and willful conduct of these defendants in effectuating the knowing and wanton violation of Plaintiffs' constitutional rights, Plaintiffs are entitled to recover punitive damages against these individual defendants in an amount according to proof at trial

**SECOND CLAIM FOR RELIEF (42 USC §1983)**

**Non-Consensual Unwarranted Medical Examinations, Medical Procedures, and Genital Examination**

**(By All Plaintiffs Against All Defendants; Defendants, DOE HHSA Workers 2 - 10, and DOES 1 through 50, inclusive)**

98. Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

99. At all relevant times, the constitutional right to remain free of non-consensual intrusive medical examinations and to make decisions regarding the medical care of one's child has been so "clearly established" that any reasonable HHSA worker in Defendants' circumstances would know that it is a violation of Plaintiffs' constitutional rights to subject their child to a forensic medical examination without just cause, parental consent, or a court order/warrant authorizing the examination. See, Swartwood v. County of San Diego, 2014 U.S. Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014) "[T]he Constitution assures parents, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has

1  determined, upon notice to the parents, and an opportunity to be heard, that
2  grounds for such an examination exist and that the administration of the procedure
3  is reasonable under all the circumstances."]; see also, Mann v. Cty. of San Diego,
4  907 F.3d 1154, 1163 (9th Cir. 2018).

5  100. These Defendants, and each of them, violated said rights first when they
6  directed that such an unwarranted forensic/investigational medical examination be
7  performed without first obtaining a proper warrant or knowing and voluntary
8  parental consent; then again when they excluded Plaintiffs from At.B. and Al.B.'s
9  followup medical examinations without any just or legal cause. Finally, All
10 Defendants further violated Plaintiffs' constitutional rights when they, themselves,
11 and allowed others to perform, an examination of At.B. and Al.B. – and took
12 pictures of their body parts for their own purposes.

13 101. In addition to the foregoing, parents also have a guaranteed constitutional
14 right arising from the liberty interest in family association to be with their children
15 while they are receiving medical attention or undergoing medical procedures.
16 Wallis ex rel. Wallis v. Spencer, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). This right
17 includes the right of parents to make important medical decisions for their children.
18 Id. at 1141. 214. No reasonable HHSA agent in these Defendants' position could
19 have believed that the above mentioned conduct was lawful or even abstractly
20 justifiable. In fact it was not.

21 102. These Defendants, and each of them, had an affirmative duty and obligation
22 to recognize, acknowledge, and respect Plaintiffs' constitutional rights and to
23 conduct themselves in a manner that confirms to, provides for the preservation of,
24 and does not violate those rights. These rights include, without limitation, the right
25 to privacy, family integrity and the right to remain free of non-consensual

36

unwarranted forensic medical examinations, the right to be present at such examinations absent an affirmative showing of good cause for exclusion, the right to control and participate in medical decisions relative to their children – all arising under the First and Fourteenth Amendments to the United States Constitution.

103. These Defendants, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, the performance of unwarranted and non-consensual medical examinations and procedures on Plaintiffs' children.

104.  As a direct and proximate consequence of said misconduct, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish and other emotional injury according to proof at trial.

105. In doing the things alleged herein, these Defendants, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against these individual Defendants, and each of them, according to proof at trial.

## THIRD CLAIM FOR RELIEF (42 USC §1983)

**Deception in The Creation of and/or Presentation of Evidence/False Reporting**

   **(By All Plaintiffs All Defendants, DOE HHSA Workers 2 - 10, and DOES 1**
   **through 50, inclusive)**

106. Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

107. The right to familial association guaranteed under the Constitution's Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker and/or child abuse investigator, or other governmental agent, or person

acting in an investigatory capacity – including these Defendants, and each of them, would know it is unlawful to continue to detain a child from the care, custody and control of its parents based on knowingly false, and/or based on a juvenile court order which the particular Defendant fraudulently obtained, or caused to be fraudulently obtained.

108. Plaintiffs are further informed and believe and thereon allege that the right of a parent to remain free of the government's fraudulent creation and/or presentation of false, misleading, and/or deceptive, and/or suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these Defendants' circumstances would know it is a violation of the constitution to either create, or present deceptive evidence against a parent in juvenile court proceedings. Hardwick v. Cty. of Orange, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate."

109. At all relevant times alleged herein, Defendants, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain, and continue to detain, At.B. and Al.B.

from Plaintiffs' custody first by creating false evidence, then later by presenting known materially false, incomplete, and misleading evidence to the Juvenile Court.

110. The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming them both personally and in their relationship with their children, At.B. and Al.B.

111.. These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution – and did violate their rights by, but not limited to: The creation and propagation of false information in Defendants' contact notes, including but not limited to, Application and Declaration in Support of Order Authorizing Entry Into Home, and Detention Report with the intention that said information be incorporated into later Court Reports by others; and then later, by the making of knowingly false reports of child neglect and child endangerment; the intentional fabrication of inculpatory evidence by All Defendants, DOE HHSA Workers 2 - 10, and DOES 1 through 50, inclusive – all knowing and intending that it would be presented to the Juvenile Court, accepted into evidence, and relied upon by the juvenile court in making its decisions.

112. The aforementioned misrepresentations and omissions, and others, were material to the outcome of the Detention Hearing in that, as alleged herein above, the Juvenile Court accepted them into evidence and relied upon them in making each and every one of its findings and orders.

113. The aforementioned conduct by All Defendants, and each of them, was malicious and had the effect of denying Plaintiffs their right to a fair hearing as well as their rights to continued custody of their children, At.B. and Al.B., for an

1  unnecessary and excessive period of time. By spreading lies, maliciously refusing to

2  provide exculpatory evidence, and presenting fabricated evidence to the Juvenile

3  Court during the pendency of the dependency proceedings these Defendants, and

4  each of them, knowingly and intentionally violated Plaintiffs' rights arising under

5  the First and Fourteenth Amendments to the United States Constitution.

6  114. As a direct and proximate result of these Defendants' actions Plaintiffs have

7  suffered and will continue to suffer economic injury, mental and emotional injury

8  as well as physical manifestations of such mental and emotional suffering, all to an

9  extent, degree, and amount subject to proof at trial.

10  115. Plaintiffs are informed and believe and thereon allege that Defendants, and

11  each of them, acted with malice, oppression and fraud or otherwise acted with a

12  willful, wanton, knowing, and conscious disregard for Plaintiffs' rights in a

13  despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an

14  award of punitive damages for the purpose of punishing these Defendants, and

15  each of them, in order to deter them, and others similarly situated, from similar

16  such misconduct in the future.

17  **FOURTH CLAIM FOR RELIEF (42 USC §1983)**

18  **Malicious Prosecution**

19  **(By All Plaintiffs Against All Defendants, DOE HHSA Workers 2 - 10,**

20  **and DOES 1 through 50, inclusive)**

21  116. Plaintiff incorporates all of the above allegations as though fully set forth

22  herein.

23  117. At all relevant times, Plaintiffs had a cognizable and constitutionally protected

24  right to familial association.

25

118. As per the above allegations, Defendant Piva, and her HHSA accomplice, seized At.B. and Al.B. without a proper warrant, in the absence of any exigent circumstance and without first completing a reasonable investigation. She then knowingly inserted false information into her notes and entries thus setting in motion the series of events that ultimately led to the initiation of Juvenile Dependency proceedings.

119. Upon receiving the information from Piva, Defendants all together made the decision to initiate juvenile dependency proceedings by filing their initiating petition.

120. On information and belief, as the Juvenile Dependency case progressed, in consultation with Defendant Piva and with her approval and advice, Defendant Piva continued to press her knowingly false claims against Plaintiffs without probable cause and in an effort to sever their custodial relationship with their children.

121. On information and belief, these Defendants, and each of them, contrived the charges against these Plaintiffs to justify Defendants seizure of At.B. and Al.B., submitted false reports, initiated Juvenile Dependency proceedings in bad faith, and continued to detain At.B. and Al.B. from their parents when there was no legitimate evidentiary basis to do so with the intention of interfering Plaintiffs' constitutionally protected familial rights.

122. In doing the things alleged herein above, these Defendants, and each of them, engaged in intentional, knowing, and malicious misconduct with the purpose of depriving the Plaintiffs of their constitutionally protected right to the custody, care, and control of their children, At.B. and Al.B., – and then continued the dependency proceedings for a prolonged period of time when they knew there was no legitimate basis to do so.

123. Plaintiffs obtained a favorable termination to the proceedings when the Juvenile Dependency case was dismissed in the interest of justice without any jurisdictional finding having been made.

124. In summary, these Defendants, and each of them, initiated Juvenile Dependency proceedings to strip Plaintiffs of their rights to the care, custody, and control of their children without probable cause with malice through the use of fabricated and false evidence as well as suppressed material exculpatory information.

125. The aforementioned conduct by these Defendants, and each of them, was malicious and had the effect of denying Plaintiffs their right to a fair hearing as well as their rights to continued custody of their children, At.B. and Al.B.., for an unnecessary and excessive period of time. By spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court during the pendency of the dependency proceedings these Defendants, and each of them, knowingly and intentionally violated Plaintiffs' rights arising under the First and Fourteenth Amendments to the United States Constitution.

126. As a direct and proximate result of these Defendants' actions Plaintiffs have suffered and will continue to suffer economic injury, mental and emotional injury as well as physical manifestations of such mental and emotional suffering, all to an extent, degree, and amount subject to proof at trial.

127. Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, acted with malice, oppression and fraud or otherwise acted with a willful, wanton, knowing, and conscious disregard for Plaintiffs' rights in a despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing these Defendants, and

each of them, in order to deter them, and others similarly situated, from similar such misconduct in the future.

### FIFTH CLAIM FOR RELIEF (42 USC §1983)

### Monell Related Claims

### (By Plaintiffs Against Defendant County of San Joaquin)

129. Plaintiff incorporates all of the above allegations as though fully set forth herein.

130. Defendant County of San Joaquin, including through its entity HHSA, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs and those similarly situated to establish, implement and follow policies, procedures, customs and/or practices which conform with, and provide for the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, protection of the right to substantive and procedural due process and to be free of unwarranted governmental interference in the custody of their children, At.B. and Al.B., C.H 243. Defendant County of San Joaquin also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within HHSA, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.                     **Count One**

### Unwarranted Seizure of a Child

131. Plaintiff incorporates all of the above allegations as though fully set forth herein.

132. Based on the duties charged to the County and delegated to its social workers, including the powers to seize children from their parents' custody, the County knew or should have known of the need to establish policies, practices, and customs required to protect the civil rights of parents and children with whom their agents regularly came into contact – and to adequately train its HHSA workers.

133. At the time of the underlying events, the County's customs and practices relating to the removal of a child from its parent's custody included, but were not limited to: a. The custom and/or practice of removing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury). b. The custom and/or practice of removing children from their parent's custody without first performing a reasonable investigation. c. The custom and/or practice of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation would turn up facts suggesting the seizure was justified. d. The custom and/or practice of continuing the detention of children from their parents in spite of the fact that there was no known legitimate or legal basis to do so. e. The custom and/or practice of requiring a social worker to follow written policies, procedures, and/or practices, when seizing a child from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury. f. The custom and/or practice of requiring a non-offending parent to admit unproven allegations to prevent removal of a child from his or her custody. (See, e.g., Parkes v. Cty. of San Diego, 345 F. Supp. 2d 1071, 1092 (S.D. Cal. 2004).) g. The custom and/or practice of removing children from a parent's custody without consent or a proper court

order, and in the absence of specific, articulable evidence that a particular parent was likely to cause serious physical bodily injury to that child.

134. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to the removal of a child from its parent's custody.

135. When Defendants Piva and her HHSA accomplice, DOE HHSA Workers 2 - 10, and DOES 1 through 50, inclusive, seized At.B. and Al.B. from Plaintiffs' custody, they were acting pursuant to and in accordance with the County's child removal customs, polices, and practices. Defendants Piva and her HHSA accomplice, DOE HHSA Workers 2 - 10, and DOES 1 through 50, inclusive, decision to seizure and seizure of At.B. and Al.B. was within the training and standards Defendants received from the County.

136. At.B. and Al.B.'s unwarranted seizure and continued unjustified detention from his parents was not an isolated incident. Instead, County social workers and supervisors regularly seize children from their parent's custody without consent, court order, and/or exigency. These past unlawful seizures have resulted in several lawsuits against multiple offending social workers (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Thus, the County of San Joaquin is, at minimum, on at least inquiry notice of the existence of a substantial deficiency in its policies, customs, and/or practices.

137. Over the years, the County and its employees engaged in similar violations of constitutional rights by seizing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious physical bodily injury). These unlawful seizures have resulted in

45

several lawsuits against multiple offending social workers (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Several of these lawsuits ended with substantial settlements. Accordingly, Plaintiffs are entitled to partial summary judgment against [the County Social Workers and Social Worker Supervisor(s).

138. The County never investigates or disciplines its social workers who seize children from their parents' custody without consent, proper court order, and in the absence of exigency.

139. The County did not investigate or discipline Defendants for their unwarranted seizure of At.B..and Al.B. – even though Defendants admitted that unwarranted At.B. and Al.B.'s seizure violated Plaintiffs' rights. Nor has the County disciplined any of the individual Defendants for failing to intervene to stop At.B. and Al.B's unwarranted seizure, even though it was admittedly obvious the seizure was unlawful. The County did not discipline any of the individual Defendants for as a result of At.B. and Al.B's admitted unwarranted seizure from Plaintiffs' custody.

140. Even though the County has been consistently sued for similar such conduct on multiple occasions, and admits that further and/or better training and supervision is needed, the County has remained deliberately indifferent to this admitted need and has refrained from implementing a further, constitutionally adequate, program of training and supervision. Thus, through it's action or inaction, the County ratified and/or approved of these Defendants' unwarranted seizure of At.B. and Al.B.

141. The County has consistently failed to adequately train its social workers and agents on the constitutional rights of a parent and child, including but not limited to: a. The circumstances under which a court order must be obtained prior to

removing a child from the custody of its parent(s). b. The fact that a court order or parental consent must be obtained prior to removing a child from the custody of its parent(s), when there is no exigency. c. That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence" that a child is in imminent danger of suffering serious bodily injury. d. That a social worker cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed. e. That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

142. The County does not adequately train its "weekend" social workers as to the County's child removal protocols or a parent, how to complete a proper child abuse investigation, how to make a proper determination regarding detention of a child, and a parent and child's Constitutional Rights. The County does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure.

143. The County's deliberate failure to train its agents on these established constitutional rights, and to avoid violating them, was a substantial factor and moving force in causing Plaintiffs harm. Without adequate training, the individual Defendants were unfamiliar with and oblivious to Plaintiffs' rights when they seized At.B. and Al.B.'s– without consent, proper court order, or exigency.

144. The County knew or should have known that a parent and child cannot be separated without consent, court order, and/or exigency. But, the County has knowingly refrained from (1) revising and/or implementing its child removal customs and protocols, and (2) from training its social workers that a child cannot be removed without consent, court order, and/or exigency. In addition, the County

has consistently refused and refrained from investigating and/or disciplining its social workers for removing a child without consent, court order, and/or exigency – including the individual Defendants in this case.

145. These actions, and/or inactions, of the County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

## Count Two

## Unwarranted Investigatory Medical Exam/Procedures

146. Plaintiff incorporates all of the above allegations as though fully set forth herein.

147. As detailed above, County of San Joaquin regularly and systematically performed, and to this day continues to perform on a regular basis, non-consensual unwarranted invasive forensic medical examinations and/or medical assessments upon children in relation to whom referrals of suspected child abuse have been received.

148. The County has known that parents have a constitutional right to be present for their child's medical procedures. San Joaquin County regularly requests these medical examinations be performed without notifying either parent prior to the examination. Moreover the County regularly requests that parents be excluded from the examination room in violation of those same constitutional rights.

149. The County, at all relevant times, had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

150. Based on the duties charged to the County of San Joaquin, its policymaking officials knew or should have known of the need to establish such customs, policies, and practices as were required to protect the rights of children and parents to remain free of unwarranted non-consensual forensic medical examinations and medical procedures.

151. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to performing a medical examination, assessment, and/or procedure on a child.

152. At the time of the underlying events, the regularly established customs and practices of the Defendant County that were followed, adhered to, complied with, and carried out by the individual Defendants in this case were the moving force that caused the violations of the Plaintiffs constitutional rights including, but not limited to the following policies, customs, and/or practices: a. The custom and/or practice of subjecting children to unwarranted, non-consensual forensic medical examinations and/or investigatory medical assessments. b. The custom and/or practice to exclude a parent from the examination room during the forensic medical examination and/or investigatory medical assessments. c. The custom and/or practice of barring a parent from access to the child's medical records even though the parent retains medical rights. d. The custom and/or practice of subjecting children to unwarranted nonemergency medical procedures, including x-rays and/or CT Scans without a parent's knowledge and/or consent. e. The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants' agents can regularly be expected to come into

contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, relative to a parent and child's medical rights when performing actions related to child abuse investigations. f. The custom and/or practice of improperly using the medical treatment consent form to perform investigatory medical examinations and/or procedures on a child – that are not designed and/or intended to treat or heal that child. (See, e.g., Swartwood v. Cty. of San Diego, 84 F. Supp. 3d 1093, 1123-1124 (S.D. Cal. 2014).) g. The custom and/or practice getting a parent to sign a medical treatment consent form without the parent's informed consent, under duress, under coercive circumstances, by threatening to obtain a court order, and/or by threatening to ensure the child will never be returned to that parent's custody. h. The custom and/or practice of performing investigatory medical examinations, assessments, and/or procedures without providing notice to parents (other than just the Polinski Intake Exam).

153. When the individual Defendants either performed or directed that At.B and Al.B., be subjected to an investigatory examinations, assessments, and/or procedures they were acting pursuant to and in accordance with San Joaquin County's customs, unwritten policies, and practices with regard to conducting such examinations without first obtaining a warrant or parental consent under non-emergency circumstances. Defendants were acting within the training and standards Defendants received from the County, when they performed and/or

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

directed that At.B. and Al.B. be subjected to investigatory medical assessments, examinations, and/or procedures.

154. At.B and Al.B.'s unauthorized and/or unwarranted invasive investigatory medical examinations, assessments, and/or procedures, and/or the exclusion of Plaintiffs from At.B. and Al.B.'s medical examinations, assessments, and/or procedures, was not an isolated incident. Instead, County social workers and supervisors regularly perform unauthorized and/or unwarranted invasive investigatory medical examinations, assessments, and/or procedures on children, and/or exclude parents from a child's medical examinations, assessments, and/or procedures. This conduct has resulted in several lawsuits against multiple offending social workers and supervisors (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Thus, the County of San Joaquin is, at minimum, on at least inquiry notice of the existence of a substantial deficiency in its policies, customs, and/or practices.

155. Over the years, the County and its employees engaged in similar violations of constitutional rights by seizing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious physical bodily injury). These unlawful seizures have resulted in several lawsuits against multiple offending social workers (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Several of these lawsuits ended with substantial settlements.

156. As a matter of routine, the County of San Joaquin never investigates or disciplines its HHSA employees, contractors, and/or agents who perform investigatory medical examinations, assessments, and/or procedures on children — without consent, court order, exigency. Nor does the County as a matter of practice

even inquire to determine whether there was a basis to perform the requested examinations.

157. Here, San Joaquin County did not investigate or discipline the individual Defendants for performing the unwarranted investigatory medical examinations and/or procedure on At.B. and Al.B., including taking pictures of their bodies. The County did not investigate or discipline Defendants for the unauthorized, non-consensual, and non-emergent investigatory medical assessment, examination, and/or procedure – even though Defendants admitted that Plaintiffs' Rights were violated.

158. Moreover, Defendant San Joaquin County refuses to admit that performing an examination and/or procedure without parental consent, court order, and/or exigent circumstances violates a parent's and child's constitutional rights. Defendant denies that either it, or the individual Defendants, violated Plaintiffs' rights when Defendants subjected At.B. and Al.B.'s these unwarranted examinations and/or procedures without parental consent, emergency or a proper court order.

159. Similarly, Defendant denies that either it or the individual Defendants violated Plaintiffs' rights when Defendants examined and took photographs of At.B. and Al.B.'s body parts without parental knowledge, consent, or proper court order.

160. Defendant County of San Joaquin ratified and/or approved of At.B. and Al.B's non-consensual unwarranted investigatory medical examinations and procedures.

161. Defendant County of San Joaquin knowingly and with deliberate indifference failed to train its HHSA employees and/or agents on the constitutional rights of a parent and children, including but not limited to: a. That a child cannot be examined outside the presence of his or her parent(s) – without judicial authorization or

---

52

parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury. b. That a child cannot be subjected to an investigatory medical examination – without parental consent, court order, and/or exigent circumstances. c. That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual investigatory medical examination on a child. d. That an HHSA worker cannot examine a child's sex organs, and take photos of them, without parental consent or court order. e. That a parent has a right to notice for and a right to be present at investigatory medical examinations, assessments, and/or procedures. f. Getting a parent to sign a medical treatment consent form without the parent's informed consent, under duress, under coercive circumstances, by threatening to obtain a court order, and/or by threatening to ensure the child will never be returned to that parent's custody. g. Performing investigatory medical examinations, assessments, and/or procedures without providing notice to parents (other than just the Polinski Intake Exam).

162. The County does not adequately train its "weekend" social workers as to investigatory medical examinations, assessments, and/or procedures, and a parent and child's Constitutional Rights. The County does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure.

163. Without adequate training, the individual Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected At.B. and Al.B. to investigatory medical examinations and/or procedures – without parental consent, proper court order, and/or exigency.

164. San Joaquin County's non-consensual unwarranted investigatory medical examination of At.B and Al.B. was not an isolated incident specific to Plaintiffs' circumstances. On the contrary, such warrantless non-consensual medical examinations and procedures are routine, regular and recurring events, and are perpetrated by San Joaquin County and its HHSA workers on a daily, or near daily, basis in the same or similar circumstances as alleged herein.

165. The County of San Joaquin has engaged in each of the above customs and/or practices on an ongoing and continuous basis since well before the events described herein, and continues to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

166. These customs, policies, and/or practices and lack of adequate training and supervision of Defendant County were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial.

<h3 style="text-align:center">Count Three</h3>

<h3 style="text-align:center">Judicial Deception</h3>

167. The County and its policymaking officials knew, or in the exercise of reasonable care, should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of children with whom their agents regularly came into contact – and to adequately train its HHSA employees regarding constitutionally appropriate policies and practices.

168. Defendant County of San Joaquin established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the individual Defendants, and each of

54

them when they violated Plaintiffs constitutional rights by engaging in deception in the presentation of evidence to the Juvenile Court, among other things.

169. At the time of the underlying events, the regularly established customs and practices of the County of San Joaquin and the HHSA were followed, adhered to, complied with, and carried out by the individual Defendants, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to: a. The custom and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court. b. The custom and/or practice of suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the juvenile court. c. The custom and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, in an effort to bolster the credibility of the document, and/or report. d. The custom and/or practice of placing alleged statements of third party witnesses in quotation marks when in fact those third party witnesses did not say was the HHSA worker claimed. The purpose of such practice is to lend further weight and credibility to false and/or fabricated information the particular HHSA worker presents to the Juvenile Court.

170. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to requirement to be truthful, honest, and accurate, and to not suppress known exculpatory evidence in reports to the Juvenile Court. The County of San Joaquin did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports to the court.

171. When Defendants, and each of them, engaged in deception in the presentation of evidence to the Juvenile Court, they were acting pursuant to and in accordance with the County's regularly established customs and/or practices. Indeed, the reports and/or other documents, filed with the Juvenile Court in the underlying dependency case at issue here, were reviewed and approved by HHSA supervisors. Defendants were acting within the training and standards Defendants received from the County, when they engaged in deception in the presentation of evidence to the Juvenile Court.

172. The individual Defendants' presentation of false, fabricated, incomplete and fraudulently misleading evidence to the Juvenile Court was not an isolated incident specific to Plaintiffs' circumstances or the circumstances of this particular case. Instead, the County and its HHSA workers regularly include false statements, and/or suppress known exculpatory evidence, in reports and/or other documents filed in the Juvenile Court.

173. Defendants engaging in deception in the presentation of evidence to the Juvenile Court, was not an isolated incident. Instead, County social workers and supervisors regularly engage in deception in the presentation of evidence to the Juvenile Court. This conduct has resulted in several lawsuits against multiple offending social workers and supervisors (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Thus, the County of San Joaquin is, at minimum, on at least inquiry notice of the existence of a substantial deficiency in its policies, customs, and/or practices. Yet, the County of San Joaquin has habitually and deliberately turned a blind eye to the problem and refrained from taking any reasonable steps to rectify it.

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

174. Over the years, the County and its employees engaged in similar violations of constitutional rights by engaging in deception in the presentation of evidence to the court. Such deceptive conduct by County HHSA workers has resulted in lawsuits and claims against multiple offending HHSA workers (for similar violations of constitutional rights) and San Joaquin County (for its customs being the moving force behind these violations). Several of these lawsuits ended with substantial settlements.

175. Yet, for whatever reason, the County of San Joaquin never investigates or disciplines its HHSA who actually do engage in deception in the presentation of evidence to the Juvenile Court. The County of San Joaquin consistently fails to investigate or discipline social workers and their supervisors who are involved in alleged constitutional violations so that violations of citizen's constitutional rights have not only become accepted, but are customary.

176. The County did not investigate or discipline the individual Defendants in this case for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the Juvenile Court.

177. The County habitually refuses to admit that its HHSA workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that the individual Defendants in this case violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

178. The Defendant County of San Joaquin is aware that its HHSA workers frequently make false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the Juvenile Court. Yet, Defendant County of San Joaquin has made the knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children to not be lied about in court reports and the requirement that all material exculpatory evidence is required to be presented to the Juvenile Court.

179. The Defendant County of San Diego's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

180. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff harm, in that individual Defendants, and each of them, followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of HHSA when they made false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – none of which was constitutionally permissible.

181. The County of San Joaquin has openly taken the position that it is not clearly established and/or understood that a social worker could not lie and/or fabricate evidence in proceedings before the juvenile court. The County of San Joaquin has

also taken the position that a social worker does not violate constitutional rights when they suppress exculpatory evidence in juvenile proceedings. These "positions" constitute unwritten policies of the County.

182. Without such policies, procedures, customs and/or practices in place, the County of San Joaquin HHSA Workers have been allowed and permitted to engage in conduct that was in violation of Plaintiff's constitutional rights as more specifically set out in the General Allegations above.

183. Defendant County's failure to adopt appropriately prophylactic policies and training was the moving force behind the violations of Plaintiffs' constitutional rights. Such failures include, but are not limited to the following: a. The County of San Joaquin did not have a written policy, procedure, custom, practice and/or recurrent training delineating the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments. b. The County of San Joaquin did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker must disclose all known exculpatory evidence to the Juvenile Court. c. The County of San Joaquin did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker is precluded from knowingly including false statements in documents or reports to the juvenile. d. The County of San Joaquin did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports (and other filings) with the court. e. The County of San Joaquin did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to have personal knowledge of the facts and/or statements made in a petition, document, and/or report, when attesting to the veracity of those allegations, facts, and/or

statements. f. The County of San Joaquin did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to conduct an independent investigation to determine whether the allegations, facts, and/or statements in a petition, document, and/or report were true, before attesting to the veracity of those allegations, facts, and/or statements. g. The County of San Joaquin did not have a policy or procedure that addressed California Government Code, §820.21, i.e. civil immunity for a social worker is lost if they commit perjury, fabricate evidence, or fail to provide known exculpatory evidence. 184. By deliberately refraining from promulgating any of the aforementioned policies, procedures, customs, practices and/or training, the County permitted the aforementioned basic policy decisions to be made by the lower level social workers in the field. As a result, the Defendant County of San Joaquin's policy, custom, and/or practice – as established, adopted, and implemented by the individual Defendants in this case, and each of them, was to make false statements and/or suppress known exculpatory evidence in reports and documents filed with the Juvenile Court, and to continue to detain the children or otherwise cause the continued detention of the children even thought it was known that there was no legitimate "true" basis to do so.

185. These policies, customs, and/or practices – that disregard the Plaintiffs' constitutional protections – were a substantial factor in causing harm to the Plaintiffs'. Thus, as a matter of law, because there was no formal policy preventing the aforementioned misconduct, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions – which is exactly what they did when they made false statements and/or

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS

suppressed known exculpatory evidence in reports and documents filed with the Juvenile Court.

186. The state of the law regarding the constitutional protections afforded to parents and a child by the First and Fourteenth Amendments was clearly established well before December, 2018. As such, the Defendant County of San Joaquin knew before 2018 that its HHSA workers required recurrent training on the constitutional protections afforded to parents and children.

187. Despite this knowledge, the Defendant County of San Joaquin deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its HHSA workers on the following constitutional protections: a. That a social worker must disclose all known inculpatory and exculpatory evidence to the juvenile court. b. That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court. c. That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents or reports to the juvenile court. d. That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers. e. That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents and/or reports that will be relied upon by subsequent social workers. f. That quotation marks can only be used when the speaker's words are being reproduced verbatim.

188. The County does not adequately train its "weekend" social workers to be truthful, honest, accurate, and to not engage in deception in the presentation of evidence, and a parent and child's Constitutional Rights. The County does not

1  provide training on all policy updates, and does not expect its social workers to

2  know every policy or procedure.

3  189. Defendant County of San Joaquin 's deliberate failure to train its HHSA workers

4  on these established constitutional protections was a substantial factor in causing

5  the Plaintiffs harm, in that HHSA agents were unfamiliar with and oblivious to the

6  Plaintiffs constitutional rights, when they made false statements and/or

7  suppressed known exculpatory evidence in reports and documents filed with the

8  Juvenile Court, and then continued to detain the children from their Plaintiffs' care

9  for a period of months even though they knew there was no legitimate basis to do

10  so.

11  190. The practice of turning a deliberate blind eye to the need for further or

12  adequate training by ignoring repeated violations of the rights of children and

13  parents with whom HHSA agents can regularly be expected to come into contact

14  by failing and/or refusing to implement a practice of regular and adequate training

15  and/or supervision, and/or failing to train and/or supervise its officers, agents,

16  employees and state actors, in providing and ensuring compliance with the

17  constitutional protections guaranteed to individuals, including those under the

18  First and Fourteenth Amendments to the United States Constitution.

19  191. Defendant County of San Joaquin, including by and through its entity HHSA

20  and its policymaking officials, breached its duties and obligations to Plaintiffs by,

21  but not limited to, failing to establish, implement and follow the correct and proper

22  constitutional policies, procedures, customs and practices; by failing to properly

23  select, supervise, train, control, and review its agents and/or employees as to their

24  compliance with constitutional safeguards; and by deliberately permitting the

25  individual Defendants, and each of them, to engage in the unlawful and

1  unconstitutional conduct as herein alleged, with a total and deliberate indifference
2  to Plaintiffs' rights.

3  192. Defendant County of San Joaquin knew, or should have known, that by
4  breaching the above-mentioned duties and obligations that it was reasonably
5  foreseeable that its agency policies, practices, customs, and usages would, and did,
6  directly cause Plaintiffs to be injured and damaged.

7  193. These actions, and/or inactions, of the Defendant County of San Joaquin were
8  the moving force behind, and direct and proximate cause of Plaintiffs' injuries. As
9  a result, Plaintiffs has sustained general and special damages, to an extent and in
10 an amount to be proven at trial.

11                              **JURY DEMAND**

12      Plaintiffs, Lloyd Thomas Bernhard, II and Stephanie Celeste Tejada-Otero,
13 demand a jury trial as to all issues so triable.

14                                **PRAYER**

15      WHEREFORE, Lloyd Thomas Bernhard, II and Stephanie Celeste Tejada-Otero
16 pray for judgment against Defendants, and each of them, as to all causes of action,
17 as follows:

18      1. General damages and special damages according to proof, but in no event
19 less than $1,000,000;

20      2. As against the individual, human being, Defendants, punitive damages as
21 allowed by law;

22      3. Attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other
23 appropriate statute;

24      4. Injunctive relief as allowed by law;

25

                                    63

1        5. Such further relief as the Court deems just and proper.

2

3    Dated: January 4, 2023

4                                                      Lloyd Thomas Bernhard, II
                                                        Plaintiff In Pro Se
5

6    Dated: January 4, 2023

                                                        Stephanie Celeste Tejada-Otero
7                                                      Plaintiff In Pro Se

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FIRST AMENDED COMPLAINT
BERNHARD, TEJADA-OTERO vs. COUNTY OF SAN JOAQUIN
Case No.: 2:21-cv-0172 TLN DB PS